309 Ga. 400
FINAL COPY

S20A0254.  STEPP-McCOMMONS v. THE STATE.

McMILLIAN, Justice.

Appellant Contevious Stepp-McCommons appeals his convictions for felony murder and other crimes in connection with the shooting death of Clarence Gardenhire.[1] On appeal, Stepp-

---

[1] Gardenhire was killed on August 19, 2013. On November 21, 2013, a DeKalb County grand jury indicted Stepp-McCommons and his co-defendant Malik DeShawn Rice for malice murder, felony murder predicated on aggravated assault, two counts of aggravated assault, possession of a firearm during the commission of a felony, and criminal attempt to commit armed robbery. At a joint trial that took place from February 10 to 13, 2015, a jury acquitted Stepp-McCommons of malice murder but returned verdicts of guilty on all other charges. On February 23, 2015, the trial court sentenced Stepp-McCommons to serve life in prison without parole for felony murder, five years to serve consecutively for possession of a firearm during the commission of a felony, thirty years to serve concurrently for criminal attempt to commit armed robbery, and twenty years to serve consecutively for one count of aggravated assault against Jamal Perry. The remaining count of aggravated assault against Gardenhire merged into the felony murder count for sentencing purposes. Rice's case is not part of this appeal.

On March 12, 2015, Stepp-McCommons moved for a new trial, and he amended that motion on September 26, 2016, November 6, 2017, and February 9, 2018. After motion hearings on November 8, 2017, and January 11, 2018, the trial court denied the motion for new trial as amended on February 1, 2019. Stepp-McCommons filed a notice of appeal on March 1, 2019. The case was docketed in this Court to the term beginning in December 2019 and submitted for a decision on the briefs.

McCommons alleges that the trial court erred in failing to give certain jury charges and that he received constitutionally ineffective assistance of trial counsel. Because we conclude that the trial court did not err on the grounds raised by Stepp-McCommons and that he has failed to establish his claims of ineffective assistance of counsel, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed that Norman Lopez, Jr., and his brother-in-law, Jamar Perry, ran a business in which they would acquire, refurbish, and sell used cell phones. On occasion, they obtained inventory for their business by placing advertisements on websites like Craigslist. On August 19, 2013, Perry posted an ad on Craigslist seeking to purchase used cell phones. That same day, Stepp-McCommons' co-defendant Malik Rice told his girlfriend he was going to rob someone by putting an ad to sell a cell phone on Craigslist. The plan was to lure the potential buyer to an abandoned house for the transaction; Rice would hide, and then rob the buyer of the cash brought for the transaction, as well as pretend to rob the

"seller" (his co-conspirator). After at least two other people declined to participate in this plan, Rice asked Stepp-McCommons to help him that night, and Stepp-McCommons agreed to go with him.

At around 6:00 p.m. that evening, Perry received a response to his Craigslist ad from Rice, and he exchanged several text messages with Rice about purchasing cell phones, including at least one iPhone. Lopez asked his stepfather, Gardenhire, to accompany Perry to the purchase location because Perry was new to the Atlanta area. Perry and Gardenhire left for the meeting at around 9:00 p.m. and drove to the address Rice provided, where there was a house that appeared to be abandoned. Perry exited the vehicle, while Gardenhire stayed seated in the passenger seat.

Stepp-McCommons met Perry and Gardenhire when they arrived, while Rice concealed himself. Stepp-McCommons asked Perry to move closer to the abandoned house near where Rice was hiding, but Perry refused, saying he did not feel comfortable doing that. Perry testified that Stepp-McCommons became "fidgety" when he realized Perry had not come alone, and Stepp-McCommons asked

if Perry and Gardenhire were police. Perry responded in the negative and flashed the $350 in cash that was inside his wallet, saying he was just there to purchase cell phones. Gardenhire stepped out of the car and pulled up the front of his shirt to show that he was unarmed. Gardenhire then sat back down in the passenger seat, leaving the car door open.

At that point, Stepp-McCommons said, "give it up, then," pulled up his shirt, and pulled out a gun, which Rice had given to him earlier. Stepp-McCommons pointed the gun at Perry, and when Gardenhire made a sudden movement, Stepp-McCommons turned the gun toward Gardenhire, firing it in rapid succession. As soon as shots were fired, Perry ran to a nearby house to get help.

Stepp-McCommons and Rice fled. While running away, Stepp-McCommons dropped Rice's iPhone in the back yard of a house nearby, and it was recovered shortly after the shooting. One of the men who had earlier turned down Perry's request to participate in the robbery testified that he saw Stepp-McCommons and Rice after the shooting. Rice told the witness that the deal "went wrong" and

that Stepp-McCommons shot an old man.

Gardenhire, who was shot ten times, died at the hospital from his wounds. The medical examiner testified that the majority of the shots were fired downward at Gardenhire, consistent with Gardenhire being in a sitting position and the shooter standing. Nine-millimeter bullets recovered from Gardenhire's body were later matched to a nine-millimeter Smith & Wesson handgun that was found the next day in the back yard of another house near where the shooting occurred. No other gun or other caliber of ammunition was recovered at the scene or in the car in which Perry and Gardenhire were riding.

Approximately 11 days after the shooting, Stepp-McCommons spoke with police. After initially denying any involvement, he gave them a handwritten statement saying that he agreed to go with Rice the night of the shooting to sell an iPhone. Stepp-McCommons stated that he was showing the phone to one man (Perry), when the

other man (Gardenhire) pulled out a gun.[2] Stepp-McCommons said that he put his hand on Gardenhire's gun, but Gardenhire fired, so Stepp-McCommons shot back.

At trial, Stepp-McCommons testified that Rice never told him he planned to rob anyone; instead, he thought he was accompanying Rice to sell a cell phone. Nevertheless, when a friend gave Rice a gun "for protection," Stepp-McCommons knew they were going to a place where they would need protection, and Stepp-McCommons told Rice to give the gun to him. At the meeting location, Stepp-McCommons took Rice's phone to show the men while Rice waited behind a tree. Stepp-McCommons asked the men if they had any weapons, and Gardenhire stepped out of the car to show that he did not have a weapon. Stepp-McCommons testified that after sitting back down in the car, Gardenhire reached for something silver, so Stepp-McCommons "jumped" at Gardenhire, they wrestled, and Stepp-McCommons shot Gardenhire, although he "think[s]" Gardenhire

---

[2] Perry also told investigators and testified at trial that he thought Gardenhire had been reaching for a gun.

shot him first.[3] Stepp-McCommons said that he shot Gardenhire "rapidfire" because Gardenhire kept coming, although he also stated that Gardenhire never left the passenger seat of the car.

Though not enumerated as error, consistent with our customary practice in murder cases, we have reviewed the sufficiency of the evidence presented at trial. The evidence showed that Stepp-McCommons and Rice planned to meet Perry to rob him; that they armed themselves in preparation; that Gardenhire was shot ten times during the course of the robbery; that Stepp-McCommons and Rice fled the scene; and that other than the gun that Rice gave to Stepp-McCommons, there was no gun or ammunition of a different caliber recovered at the scene. Thus, we conclude that the evidence was sufficient to authorize a rational jury to reject Stepp-McCommons' claim of self-defense and to find him guilty beyond a reasonable doubt of the crimes for which he was

---

[3] Stepp-McCommons presented evidence that his left "pinky finger" was injured on the night of the shooting, and he claimed that Gardenhire had shot him there. A police officer who observed Stepp-McCommons' finger 11 days later observed a small disfigurement and abrasions to Stepp-McCommons' finger, and photographs of the injury were shown to the jury.

convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Shaw v. State*, 292 Ga. 871, 872 (1) (742 SE2d 707) (2013) ("[I]ssues of witness credibility and justification are for the jury to decide, and the jury is free to reject a defendant's claim that he acted in self-defense." (citation and punctuation omitted)).

2. Stepp-McCommons asserts that the trial court erred in failing to give his requested charge on the affirmative defense of accident and in refusing his requests to charge the jury on involuntary manslaughter and reckless conduct as lesser included offenses. To justify a jury instruction on an affirmative defense, "there need only be slight evidence supporting the theory of the charge." *Garner v. State*, 303 Ga. 788, 790 (2) (815 SE2d 36) (2018) (citation and punctuation omitted). Similarly, "in order to authorize a jury instruction on a lesser included offense, there must be some evidence in the record that the defendant committed that offense." *Daniel v. State*, 301 Ga. 783, 785 (II) (804 SE2d 61) (2017). But where "the evidence shows either the commission of the completed

offense as charged, or the commission of no offense, the trial court is not required to charge the jury on a lesser included offense." *Lupoe v. State*, 284 Ga. 576, 577-78 (2) (669 SE2d 133) (2008) (citation and punctuation omitted). "Whether the evidence was sufficient to warrant the requested instruction is a legal question, which we review de novo." *Wade v. State*, 304 Ga. 5, 8 (2) (815 SE2d 875) (2018). See also *Wilson v. State*, 279 Ga. 104, 105 (2) (610 SE2d 66) (2005).

(a) *Accident.* Stepp-McCommons argues that the trial court erred when it failed to give his requested accident charge under OCGA § 16-2-2, which provides that "[a] person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." Therefore, "[t]he affirmative defense of accident arises when a defendant contends that his acts were accidental or a product of misfortune rather than criminal intent or negligence." *Hart v. State*, 305 Ga. 681, 683 (827 SE2d 642) (2019).

In denying trial counsel's request for the charge, the trial court found that there was "not even the slightest evidence that the gun accidentally discharged." On appeal, Stepp-McCommons points to his own testimony that he did not know how many times he shot Gardenhire and that at one point when Gardenhire elbowed him, both his gun and the gun he said Gardenhire was holding hit the ground, presumably suggesting that the jury could have found that the gun discharged accidentally at that point. Moreover, Stepp-McCommons notes that he testified that he shot Gardenhire "unintentionally and not knowing."

However, Gardenhire was shot ten times, and the evidence showed that the majority of the shots were fired downward at Gardenhire with the shooter in a standing position. Stepp-McCommons testified that he shot Gardenhire because Gardenhire was coming at him with a weapon. Stepp-McCommons also said he kept shooting "rapidfire" because Gardenhire kept coming at him and he was trying to get Gardenhire to stop. Additionally, Stepp-McCommons explained that he shot Gardenhire "unintentionally

and not knowing" because he never had the intention to "murder" Gardenhire; rather, "[he] had the intention just to save [himself] from getting shot by Mr. Gardenhire." Stepp-McCommons further testified that he shot Gardenhire before Gardenhire elbowed him and knocked his gun to the ground, and no evidence was presented showing that any bullet struck Gardenhire in an upward trajectory, consistent with a gun discharging when it hit the ground.

Therefore, the evidence, including Stepp-McCommons' own testimony, shows that Stepp-McCommons intended to shoot the gun at Gardenhire, and there was no evidence supporting his argument that the jury could have found the shooting to be the result of an accident or misfortune. Thus, the trial court did not err in refusing to charge on accident as an affirmative defense. See *Shorter v. State*, 270 Ga. 280, 280 (2) (507 SE2d 757) (1998) (trial court did not err in refusing to give accident charge where "the evidence presented at trial, including [defendant's] own testimony, demonstrated that [defendant] intentionally pointed the gun and fired[,]" and there was "no evidence from which a jury could infer that the gun was fired as

a result of accident").

(b) *Involuntary Manslaughter*. Likewise, we see no error in the trial court's refusal to give Stepp-McCommons' requested jury charge on involuntary manslaughter based on criminal negligence.

"A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony." OCGA § 16-5-3 (a). However, as we concluded above, all the evidence presented showed that Stepp-McCommons intentionally shot Gardenhire, and by Stepp-McCommons' account, no crime happened because he was shooting in self-defense. Therefore, the crimes were either committed as charged or not committed at all, and there was no evidence that he was committing a non-felonious unlawful act. Thus, he was not entitled to a jury charge under OCGA § 16-5-3 (a). See *Williams v. State*, 301 Ga. 712, 718 (5) (804 SE2d 31) (2017) (where defendant testified that he shot victim multiple times in self-defense, jury charge on involuntary manslaughter not warranted);

*Harris v. State*, 272 Ga. 455, 456-57 (3) (532 SE2d 76) (2000) (where defendant testified that he intentionally shot the victim in self-defense, a charge on the lesser offense of involuntary manslaughter is not required because "[t]he intentional use of a gun[,] the deadly force of which is known to all[,] is simply inconsistent with the lack of intent to kill which is a prerequisite in involuntary manslaughter" (citation and punctuation omitted)).

(c) *Reckless Conduct*. Stepp-McCommons also contends that the trial court erred in refusing to give his charge on the lesser included offense of reckless conduct. However, like the lesser included offense of involuntary manslaughter, "[r]eckless conduct is an act of criminal negligence, rather than an intentional act, that causes bodily harm or endangers the bodily safety of another." *Lindsey v. State*, 262 Ga. 665, 666 (2) (b) (424 SE2d 616) (1993). See also *State v. Springer*, 297 Ga. 376, 381 (1) (774 SE2d 106) (2015). Accordingly, for the reasons discussed above, we conclude that the trial court did not err in refusing to give Stepp-McCommons' requested charge on reckless conduct.

3. Stepp-McCommons also argues that the trial court committed plain error in failing to properly respond to the jury's question about the element of causation for felony murder.

To establish plain error, Stepp-McCommons must show "that the error was not affirmatively waived; that it was obvious beyond reasonable dispute; that it likely affected the outcome of the proceedings; and that it seriously affected the fairness, integrity, or public reputation of the proceedings." *Howard v. State*, 307 Ga. 12, 15 (2) (834 SE2d 11) (2019). "To prevail on this argument requires [Stepp-McCommons] affirmatively to establish all four prongs of the plain error test, which is a difficult standard to satisfy." *Reed v. State*, 304 Ga. 400, 405 (3) (819 SE2d 44) (2018).

During deliberations, the jury sent a note to the trial judge, which she read aloud in the courtroom: "Does the definition of causing for death, closed quote, in felony murder include both direct and indirect causes?"[4] The trial judge then said that she thought "the

---

[4] The jury's note was marked as Exhibit 4 but does not appear in the trial exhibits in the record. The transcript notes that Exhibit 4 was not found in the jury room when the jury was excused.

appropriate response would be something along the lines of not to comment one way or another, but simply say: 'You've been given the necessary charges; continue to deliberate.'" Stepp-McCommons' counsel responded: "Please, Your honor, yes." The trial judge then altered her wording to say, "You have been given the necessary definition in the charge; please continue." She then asked counsel, "That'll work?" Stepp-McCommons' counsel replied, "Yes, ma'am."

Pretermitting whether counsel's agreement with the trial court's response constituted an affirmative waiver of the issue, we conclude that the trial court committed no error. "[T]he need, breadth, and formation of additional jury instructions are left to the sound discretion of the trial court." *Davis v. State*, 287 Ga. 173, 175 (3) (695 SE2d 251) (2010) (citation and punctuation omitted). Therefore, "[t]he trial court had discretion to decline to answer the jury's question directly," and instead to direct the jurors to rely on instructions previously given. *Redding v. State*, 296 Ga. 471, 473 (2) (769 SE2d 67) (2015).

Here, the trial court gave the pattern jury charges on felony

murder and aggravated assault, which address the requirement of causation.[5] See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases (4th ed.) §§ 2.10.20 & 2.20.21. These charges were correct statements of the law, and the trial court could properly point the jury to them to consider in its deliberations. See *Redding*, 296 Ga. at 473 (2) ("We have never held that the court must engage in a question and answer session with the jury or instruct the jurors individually on how to apply the law to the facts." (citation and punctuation omitted)).

Moreover, Stepp-McCommons has failed to show that the failure to respond differently to the jury's question likely affected the outcome of the trial. This Court has held that "the felony murder statute requires only that the defendant's felonious conduct proximately cause the death of another person." *State v. Jackson*, 287 Ga. 646, 660 (6) (697 SE2d 757) (2010). The evidence showed that Gardenhire died directly as the result of multiple gunshots fired

---

[5] Stepp-McCommons has not pointed us to, and the record does not show, any request his counsel made in writing or during the charge conference for more specific instructions on the issue of causation.

from Stepp-McCommons' gun. Under any theory of the case, there was no issue of fact as to whether the shots caused Gardenhire's death. Thus, Stepp-McCommons failed to establish the third prong of the plain error test.

Accordingly, Stepp-McCommons has not shown that the trial court committed plain error in its handling of the jury's question.

4. Stepp-McCommons next asserts that he received ineffective assistance of counsel when his trial counsel failed to object to the trial court's response to the jurors' causation question; failed to review the discovery provided by the State and to present exculpatory or impeachment evidence based on the State's discovery; and failed to request a hearing to determine the voluntariness of his statements to police.

To establish this claim, Stepp-McCommons must prove both that his counsel's performance was constitutionally deficient and that the deficiency resulted in prejudice to his case. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Stepp-McCommons must

demonstrate that his trial counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-90 (III) (A). To meet the prejudice prong of *Strickland*, Stepp-McCommons must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694 (III) (B). This Court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697 (IV).

(a) Stepp-McCommons first asserts that his trial counsel's performance was deficient because he failed to object to the trial court's response to the jurors' question about causation. However, as we concluded that the trial court did not err in its handling of the juror's question, Stepp-McCommons cannot show that his trial counsel's performance was deficient in failing to raise an objection. See *Crump v. State*, 301 Ga. 871, 873 (2) (804 SE2d 364) (2017) ("Failure to make a meritless objection cannot be evidence of

ineffective assistance." (citation and punctuation omitted)).

Moreover, "this Court has equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim." *Hampton v. State*, 302 Ga. 166, 168-69 (2) (805 SE2d 902) (2017). Thus, even if we assume that trial counsel performed deficiently in failing to object to the trial court's response, we have already determined that Stepp-McCommons has failed to show that it was likely that the outcome of his trial would have been different if his trial counsel had so objected, so we also conclude, for the reasons discussed in Division 3, that he has failed to show the requisite prejudice under *Strickland*. See *Jackson v. State*, 306 Ga. 69, 84-85 (4) (b) (829 SE2d 142) (2019). Accordingly, the trial court correctly denied Stepp-McCommons' ineffective assistance of counsel claim on this ground.

(b) Stepp-McCommons next contends that trial counsel was deficient in failing to review the State's discovery and to present exculpatory and impeachment evidence.

The record demonstrates that trial counsel filed a motion for

reciprocal discovery, and the "Certificate of Discovery Provided by the State" includes a notation that there were three CDs in the State's file. However, trial counsel testified at the hearing on the motion for new trial that he did not have any CDs or DVDs in his file and that he did not recall either receiving or reviewing audio recordings of Stepp-McCommons' statements to police or of witness interviews. Stepp-McCommons also testified that trial counsel did not discuss any recordings with him.

During the hearings on the motion for new trial, Stepp-McCommons' appellate counsel introduced recordings from the State's file containing police interviews with Stepp-McCommons and three other individuals who testified at trial: Ivory Stepp, Lopez, and Perry. Stepp-McCommons' claim of ineffective assistance of counsel is based on the interview of Lopez by one of the DeKalb County Police detectives, during which the detective and Lopez discussed that Perry was telling multiple stories about what happened the night of the shooting and that there were differences between what he told the family and what he told police. The

detective even said that he believed Perry was lying and that he had his doubts about Perry. Stepp-McCommons asserts that trial counsel was deficient in failing to review this interview and argues that if counsel had played it at trial or used it for impeachment purposes, a reasonable possibility exists that the result of the trial would have been different.

However, Stepp-McCommons has not identified any of the purported stories or "lies" told by Perry that he contends would have been exculpatory or a proper vehicle for impeachment. The only discrepancy in Perry's stories discussed by Lopez and the detective during the interview was that Perry told police that he immediately ran when the shots were fired, but he told Gardenhire's family that he tried to help Gardenhire by displaying the money he brought to buy the phone. Lopez and the detective discussed that Perry may have been just trying to "save face" with the family. Moreover, Lopez told the detective that Perry did not own a gun, and both Lopez and the detective agreed that Perry had no motive for shooting Gardenhire as Perry was carrying the money that night, and

Gardenhire was there to help him. Accordingly, playing the tape of the interview would have shown only that Perry's contradictory statement about whether he ran or stayed at the scene to help Gardenhire initially raised doubts in the detective's mind, but Stepp-McCommons has failed to show how this evidence was exculpatory.

Moreover, as found by the trial court, the evidence in the Lopez interview was cumulative of other evidence presented at trial. The detective told Lopez during his interview that the detective's doubts about Perry came from his discussions with Gardenhire's wife and daughter, in which they expressed their concerns about Perry's conflicting stories about what had happened on the night of the shooting. At trial, Rice's counsel elicited testimony that Gardenhire's wife and daughter had approached one of the detectives to raise concerns about Perry's conflicting stories and to tell him that they did not trust Perry and did not think Perry was telling the truth. Stepp-McCommons' trial counsel referred to this evidence in his closing argument to suggest that the State was

hiding something because the investigators had not resolved these conflicts.

Thus, Stepp-McCommons has failed to show that the content of the interview contained exculpatory evidence raising a reasonable probability that, but for trial counsel's failure to play it at trial or use it for impeachment purposes, the results of the trial would have been different. Accordingly, Stepp-McCommons has failed to demonstrate that he received ineffective assistance of counsel on this ground. See *Shank v. State*, 290 Ga. 844, 848 (5) (a) (725 SE2d 246) (2012) (claim of ineffective assistance of counsel fails where appellant did not show that further investigation by counsel would have resulted in any significant exculpatory evidence and thus could not establish prejudice resulting from allegedly deficient investigation).

(c) Stepp-McCommons further argues that his trial counsel was deficient in failing to request a hearing under *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964), regarding his statements to police and that if such hearing had been held, his

statements would have been suppressed because they were improperly obtained after Stepp-McCommons invoked his rights to remain silent and to counsel under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Stepp-McCommons' trial counsel never requested a *Jackson-Denno* hearing, and the trial court did not make a ruling on the voluntariness of the statements before they were introduced at trial. Nevertheless, the State used the statements to rebut Stepp-McCommons' trial testimony.[6] Even if we assume that trial counsel was deficient in failing to request a hearing, Stepp-McCommons must still establish that he was prejudiced by this deficiency. To establish the requisite prejudice under *Strickland*, Stepp-McCommons must show that if his trial court had requested a *Jackson-Denno* hearing, his statements would have been excluded and, without the statements, a reasonable probability exists that the result of the trial would have been different. See *Griffin v. State*, 274 Ga. 211, 212 (2) (553 SE2d 271) (2001).

---

[6] The State did not present the statements in its case-in-chief.

Stepp-McCommons argues that the statements would have been excluded because he unequivocally invoked his right to remain silent and his right to counsel, but that contention is belied by the record. One of the detectives who interviewed Stepp-McCommons testified at trial that Stepp-McCommons was read his rights under *Miranda* and that Stepp-McCommons waived his rights before speaking with them. The other detective who interviewed Stepp-McCommons testified at the second hearing on the motion for new trial that it was his standard practice to review and get a waiver-of-rights form signed. Although the detective said that he did not recall Stepp-McCommons ever invoking his rights, he affirmed that the interrogation would have ceased immediately if Stepp-McCommons had done so.

Significantly, at the second motion for new trial hearing, Stepp-McCommons' appellate counsel introduced an audio recording of his statements to police. That recording confirms the detectives' testimony that they read Stepp-McCommons his rights as set out in *Miranda* and that Stepp-McCommons agreed to talk with them.

Stepp-McCommons also told the detectives in response to their questions that he could read and write English, that he had attended school through the tenth grade, and that he was not under the influence of any drugs or alcohol. Nothing on the recording indicates that Stepp-McCommons ever expressly invoked his right to remain silent or his right to counsel.[7] Even though Stepp-McCommons testified that he asked to speak to a lawyer before talking with the detectives, the trial court was entitled to credit the detectives' testimony, supported by the audio recording, over Stepp-McCommons' testimony. See *Watkins v. State*, 285 Ga. 355, 357 (1) (676 SE2d 196) (2009) ("[I]t is the function of the trial court at the hearing on the motion for new trial to determine witness credibility and to resolve any conflicts in the testimony." (citation and

---

[7] Stepp-McCommons argues on appeal that he invoked his right to silence when he noted in the interview that the waiver form said he had the right to remain silent and he asked, "What I need to do, check that?" However, the record shows that Stepp-McCommons never stated whether he intended to check the form to indicate a waiver or an invocation of his right to silence, and he did not otherwise invoke his rights. Moreover, Stepp-McCommons asked this question before the detectives had even read him his rights, and they clearly explained to Stepp-McCommons that he did not have to talk to them and that they could not talk to him about the case until he had signed the waiver-of-rights form.

punctuation omitted)).

Thus, the evidence that would have been presented at a *Jackson-Denno* hearing would have authorized the trial court, considering the totality of the circumstances and based on a preponderance of the evidence, to determine that Stepp-McCommons knowingly and voluntarily waived his rights under *Miranda* and that his statements were voluntary. See *State v. Rumph*, 307 Ga. 477, 477 (837 SE2d 358) (2019) ("'The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard considering the totality of the circumstances.'" (citation omitted). We conclude, therefore, that the trial court properly denied Stepp-McCommons' motion for new trial on this ground. See *Speziali v. State*, 301 Ga. 290, 294 (2) (a) (800 SE2d 525) (2017).

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 29, 2020 --- RECONSIDERATION DENIED JULY 15, 2020.
Murder. DeKalb Superior Court. Before Judge Boulee.

*Frances C. Kuo*, for appellant.

*Sherry Boston, District Attorney, Emily K. Richardson, Destiny H. Bryant, Elizabeth H. Brock, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.