In the Supreme Court of Georgia

Decided: June 1, 2021

S21A0250.  LEWIS v. THE STATE.

WARREN, Justice.

Appellant Jeffrey Lewis was convicted of felony murder and other crimes in connection with the fatal shooting of Delorean Patterson, who was killed during an armed robbery that Lewis, Patterson, and others carried out at a "trap house" in Atlanta in 2011.[1]  On appeal, Lewis argues that the trial court erred by

[1] The crimes were committed on the night of March 25 and the early morning of March 26, 2011.  On December 30, 2011, Lewis, Darrius Richardson, and Montavious Rosson were indicted jointly by a Fulton County grand jury for two counts of felony murder predicated on criminal attempt to commit armed robbery and aggravated assault and one count each of criminal attempt to commit armed robbery, aggravated assault, and possession of a firearm during the commission of a felony.  Lewis and Richardson each were also indicted for a third count of felony murder and the underlying crime of possession of a firearm by a convicted felon.  Lewis was tried separately in October and November 2013, and a jury found him guilty on all counts.  He was sentenced to life in prison for one count of felony murder, a consecutive ten years for possession of a firearm during the commission of a felony, and a consecutive five years for possession of a firearm by a convicted felon.  The

admitting into evidence a confession he gave to police while in custody because it was induced by a "hope of benefit"; by admitting that same confession because it was obtained in violation of his right to counsel; by denying Lewis's claim that his trial counsel was constitutionally ineffective for failing to object when the trial court refused to expound on a jury instruction; and by giving an incorrect jury instruction on the statutory accomplice-corroboration requirement. Identifying no reversible error, we affirm Lewis's convictions.

1. *Background*

(a) *Gault Street Crimes*

The evidence presented at Lewis's trial showed that on the evening of March 25, 2011, Lewis, a convicted felon, met with at least four or five men, including Patterson and Darrius Richardson,

remaining counts were merged or vacated for sentencing purposes. Lewis timely filed a motion for new trial on November 12, 2013, which was later amended on September 23, 2015, and again through his current counsel on July 19, 2017. A hearing on Lewis's motion for new trial was held on November 22, 2019, and the trial court denied the motion on January 16, 2020. Lewis filed a timely notice of appeal. The case was docketed in this Court for the term of court beginning in December 2020 and orally argued on February 4, 2021.

to rob the occupants of a house located at 1316 Gault Street in Fulton County, where they expected to find large amounts of drugs and cash. The group took two cars to the house, and several people, including Lewis and Patterson, rode in a burgundy Nissan Altima that Lewis had rented. Danielle Parks, who had dated Patterson for several months, testified that on that evening, she drove Patterson to the Doo Drop Inn to meet with Lewis. She said that while Patterson was in her car, he was on the phone with Lewis and that when she dropped Patterson off, he got into a burgundy Nissan Altima driven by Lewis with several male passengers inside.

According to Richardson, when the group arrived at the Gault Street house, Richardson and Patterson entered the house, carrying firearms and wearing bulletproof vests. The rest of the group, including Lewis, remained outside. Richardson and Patterson encountered two men inside the house and demanded money from them. One of those two men, Stephen Johns, testified that after he handed over a box of money, either Richardson or Patterson pointed a gun and "tried to shoot" him. Johns fled out the back of the house.

3

He claimed that approximately $10,000 was stolen.

While Patterson and Richardson were inside the house, gunfire erupted outside. Richardson dropped to the floor, but Patterson ran outside. Eventually, Richardson left the house and saw Patterson lying unconscious and unresponsive in the driveway. Richardson testified that he picked up Patterson, who was still wearing a bulletproof vest, and placed him in the Nissan Altima Lewis had rented.

Early on the morning of March 26, 2011, police responded to a call that a man's body was lying in front of a school. Detective Scott Demeester arrived at the scene and saw Patterson lying on his stomach with a trail of blood leading away from his body. Detective Demeester later testified that Patterson seemed to have been shot at a different location because officers did not find any shell casings near the body. A Fulton County medical examiner testified that Patterson died of gunshot wounds to the torso and that the cause of death was homicide. And a GBI firearms expert testified that the bullet fragments recovered during Patterson's autopsy were likely

4

fired from an SKS or AK-47-style rifle.

After a preliminary investigation, Detective Demeester spoke with Montavious Rosson, one of the men who stood outside the Gault Street house during the armed robbery. Based on that conversation, Detective Demeester located the Nissan Altima and discovered that Lewis had rented it using a fake driver's license. Lewis's fingerprints were located on the interior and exterior of the vehicle.

Police arrested Lewis on March 30, 2011, on an unrelated warrant. Detective Demeester—who suspected Lewis was involved in the Gault Street crimes based on his conversations with Rosson and Parks, and on evidence related to the Nissan Altima—asked Lewis to discuss the case with him. Lewis declined to do so.

(b) *Lewis's Three-Way Phone Call From Jail*[2]

On April 24, 2011, five days after an arrest warrant was issued accusing Lewis of felony murder for the death of Patterson, Lewis—

---

[2] The State filed a motion in this Court on February 22, 2021, to supplement the record with a transcript of this telephone call. Because an audio recording of the phone call is contained in the record on appeal, the transcript is unnecessary, so we deny the State's motion.

5

who was still in custody for an unrelated charge—called his sister from the Fulton County jail. During that phone call, Lewis's sister called Detective Demeester at Lewis's direction so that the three of them could discuss the Gault Street case. At the outset of the call, Detective Demeester acknowledged that Lewis was represented by counsel, and Lewis gave Detective Demeester the name of his two attorneys. Lewis then said that he had been wanting to speak with Detective Demeester at the jail; asked if Detective Demeester could get him out of jail that night; offered to take him to the scene of the armed robbery and shooting; and provided unsolicited information about the case. Detective Demeester informed Lewis that before the phone call, he had spoken with an attorney who Lewis previously claimed was representing him. However, that attorney was not one of the two attorneys Lewis mentioned at the outset of the call. Detective Demeester said that the attorney he spoke with—who apparently was not currently representing Lewis—told Detective Demeester that if he were Lewis's attorney, Lewis was "not gonna talk to you." After he was informed of this exchange, Lewis

6

nonetheless began pleading with Detective Demeester to speak with him, saying "I really need you to come down here to talk to me . . . . I'm innocent . . . I didn't do that. I'll let you know everything . . . . I can lead you to everything. That's my word man . . . . I can lead you to the scene. Do you know where the scene at?" He continued:

> I'll lead you—y'all can come get me tomorrow and I can, I can, I can try and—I can make a phone call on whoever's cell phone and find out exactly where is the address. And find out everything . . . . When we get to the scene I can show you exactly where everybody was standing and everything, Mr. Demeester.

In response, Detective Demeester asked Lewis specific questions about the Gault Street crimes, but never advised Lewis of his rights under *Miranda*.[3] Lewis then had the following exchange with Detective Demeester:

> LEWIS: *If I reach out to my attorney tomorrow and tell them that I want to talk to you, and tell them to come up with some kind of deal, can that work Detective Demeester?* Please? . . . Mr. Demeester, here's what I'm telling you, man. Here's my word, man . . . when I come down there to homicide, man, I'll take a lie detector or whatever, Mr. Demeester. I can help y'all with whatever y'all want. I can take y'all to everything . . . . [w]hatever

---

[3] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

7

y'all ask for, man, that's what I'm going to do.  That's my word, man.

. . .

DETECTIVE:  Would you want to talk to me without your attorney?

LEWIS:  *I would talk to you without my attorney, if that's what the attorney said, yes.*  That's my word, man.  I just want you to know that I didn't kill him period.

. . .

DETECTIVE:  What I'm going to do is I'm going to call the district attorney that is handling the case right now, I'm going let him know that you are reaching out to me and that you want to talk . . . but we're going to have to communicate with your attorney, man, I mean, you know, and I can almost guarantee you they're going to tell you not to talk to me.  But, you know, that's just the way it is.  What you have to understand is that you're also a grown man and you can choose, you know, if you feel that the attorney is not acting in your best interest, then you don't have to . . . you can not listen to them, you know what I mean?

(Emphasis supplied.)

Detective Demeester also told Lewis that had Lewis cooperated when he was first arrested, he "wouldn't be in this situation right now."  Lewis explained that his initial hesitancy to cooperate stemmed from his recollection of his attorney's advice in a different

8

criminal proceeding, in which Lewis's lawyer told him to never speak with law enforcement without counsel present, but that Lewis was now "willing to do everything, Mr. Demeester. That's my word. I'm talking about everything." He then repeated his offer to bring Detective Demeester to the Gault Street house and show him where everyone was standing during the armed robbery. Detective Demeester again told Lewis that he would inform the district attorney of Lewis's interest in cooperating and "go from there." The call ended after Detective Demeester told Lewis that he would be in contact "real soon," and Lewis asked Detective Demeester to stay in contact with Lewis's sister, whom Detective Demeester promised to call first thing the next morning.

(c) *Lewis's Custodial Interview*

The next day, April 25, 2011, Detective Demeester brought Lewis to the Atlanta Police Department headquarters to conduct a video-recorded interview. Before Lewis gave his statement, he acknowledged that he had contacted and asked to speak with Detective Demeester via a three-way phone call the day before. At

9

the outset of the interview, Detective Demeester confirmed Lewis's education level and that Lewis could read and write English. After Detective Demeester reviewed it with Lewis, Lewis signed a written waiver form that listed his rights under *Miranda* and memorialized that he waived his right to counsel. The following exchange then occurred:

> LEWIS: So, the DA never said they was going to try to help me out.
>
> DETECTIVE: I'm not saying that, no.
>
> LEWIS: Okay, they didn't?
>
> DETECTIVE: I'm sorry?
>
> LEWIS: They didn't at all like try—
>
> DETECTIVE: He—he stated that if you wanted to come down and make a statement . . . that you can do that.
>
> LEWIS: That's it?
>
> DETECTIVE: That's what he said, all right? You want—you want me to call your sister?

With Lewis's sister on the phone, the conversation continued:

> LEWIS: He was saying like the DA didn't say anything about like trying to help me out or whatever, but I know

it's—it's the right thing to do it anyway . . . even though I'm down here talking to him, it's not—it's not like I'm—I'm just gone come home because I'm talking to them.

LEWIS'S SISTER: So, it ain't [inaudible] help in no type of way?

LEWIS: Not really . . .

DETECTIVE: No, I'm not saying that it can't help in any way. Now, he ain't going to get out of jail tonight. I already explained that to him.
. . .

LEWIS'S SISTER: So, they ain't trying to give you help in no type of way?
. . .

DETECTIVE: That's—it—it—the way I explained to him and what I explained to you is that he has a right to come down and talk to me and provide me with a statement and that he didn't take that opportunity the first time. So, he reached out to me and this is his second opportunity. . . . So, I'm giving him a second opportunity to come down and tell me what he knows. All right? . . . So, this is his opportunity and if—and if he is honest and truthful and telling me everything that happened then his attorney could—could hopefully use that to assist him in the future.

LEWIS'S SISTER: Okay. . . . So, they ain't gone take that murder charger [sic] off you? What you didn't do.

DETECTIVE: Not right now, no. Because like I said I've only got one side of the story. I don't have [Lewis's] side

11

of the story.

After ending the call with Lewis's sister, Detective Demeester began questioning Lewis about the Gault Street armed robbery and Patterson's shooting death. Lewis then admitted to driving Patterson and others to the Gault Street house in a Nissan Altima on March 25. He explained that Richardson—whom Lewis also identified in a photo lineup—and Patterson went into the Gault Street house wearing bulletproof vests; that the rest of the group remained outside; and that after the shooting began, Lewis fired a .45-caliber gun at a vehicle parked at the end of the street until the weapon was unloaded.[4] Lewis claimed that after Patterson was shot, Lewis and others in his group drove Patterson's body to an area near a school, removed Patterson's bulletproof vest, and placed his body on the sidewalk. Lewis told Detective Demeester that he disposed of the weapons and the bulletproof vest in the woods. Lewis also drove with Detective Demeester to the Gault Street house and

---

[4] It is not entirely clear from the interview at which point during the robbery Lewis fired his gun, but his description of the events did not suggest that Patterson was hit by any of the shots Lewis fired.

pointed it out as the house where Patterson was shot.

Based on all of this information, Detective Demeester obtained and executed a search warrant on the Gault Street house. There, he identified approximately 52 bullet holes in the home's exterior and recovered two bullets from inside the house, including a .45 metal-jacketed bullet.

On December 30, 2011, Lewis was indicted for felony murder, criminal attempt to commit armed robbery, aggravated assault, possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon based on his involvement in the Gault Street armed robbery and the shooting death of Patterson.

(d) *Motion to Suppress*

Lewis filed a motion to suppress the April 24, 2011 statements he made to Detective Demeester during the three-way phone call from jail and the confession he gave during his April 25, 2011 custodial interview. He also requested a hearing under *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964), to determine

13

whether the confession was given without the "slightest hope of benefit or remotest fear of injury." OCGA § 24-8-824.

At the hearing, Lewis argued (among other things) that the statements he made during the April 24 three-way jail call were given in violation of *Miranda* and that his confession during the April 25 custodial interview was given with a "hope of benefit" and therefore inadmissible under former OCGA § 24-3-50.[5] Apparently finding that the detective was required but failed to advise Lewis of his *Miranda* rights, the trial court granted Lewis's motion to suppress statements made during the April 24 three-way call from jail. However, the trial court denied Lewis's motion to suppress the April 25 custodial interview, finding that Lewis had initiated contact

---

[5] Lewis's motion to suppress was filed on October 31, 2012, before the January 1, 2013 effective date for our current Evidence Code. See Ga. L. 2011, p.99, § 101 (new Evidence Code applies to "any *motion made* or hearing or trial commenced on or after" January 1, 2013) (emphasis supplied). But because the current Evidence Code carried forward former OCGA § 24-3-50 as OCGA § 24-8-824 without substantive change and that Code section does not have a federal counterpart, the analysis is the same under either version of the Code. See *Budhani v. State*, 306 Ga. 315, 325 n.10 (830 SE2d 195) (2019) (citation and punctuation omitted). See also *State v. Chulpayev*, 296 Ga. 764, 771 (770 SE2d 808) (2015) (same).

with Detective Demeester, was advised of and waived his rights under *Miranda*, and indicated that he understood there was no deal in place with the district attorney. The trial court thus concluded that the statements made during Lewis's April 25 custodial interview were not given with a "hope of benefit" and were therefore admissible.[6]

(e) *Trial*

Lewis did not testify at trial, but the State played for the jury the video of Lewis's April 25 custodial interview, in which he admitted his involvement in the Gault Street crimes. In addition, the State also introduced cell-site records showing that Lewis's phone was near the Gault Street house on the night of the armed robbery and shooting, as well as a text message sent from Lewis's phone on March 24, 2011—one day before the shooting—saying,

---

[6] In his written motion to suppress, Lewis also claimed that his April 24 and 25 statements were inadmissible because they were obtained in violation of his right to counsel under the Fifth Amendment to the United States Constitution and Article I, Section I, Paragraph XIV of the Georgia Constitution. It is not clear whether the trial court ruled on this issue.

As discussed in Division 2 (b) below, Lewis raises a Fifth Amendment right-to-counsel claim in this Court, and we pretermit whether it was properly preserved for review and conclude that his claim is meritless.

"Yeah, I still got the vest." The jury found Lewis guilty on all counts.

2. Lewis contends that his April 25, 2011 custodial interview—in which he confessed to participating in the Gault Street armed robbery—was inadmissible under Georgia statutory law and the United States Constitution.[7] For the reasons explained below, we reject his claim.

(a)     *Hope of Benefit Claim*

Lewis contends that the confession he made during his April 25 custodial interview was induced by "the slightest hope of benefit" and was therefore inadmissible under OCGA § 24-8-824.[8] To support this claim, Lewis points to several statements Detective Demeester made on April 24 and 25 that he says created a "hope of benefit" that the State would offer him a plea deal in exchange for

---

[7] Lewis also cites Article I, Section I, Paragraph XIV of the Georgia Constitution to support his right-to-counsel claim. However, because he neither offers authority to support his argument, nor attempts to distinguish or even compare the relevant Georgia constitutional provision with its federal counterpart, we decline to analyze Lewis's claim separately under the Georgia Constitution.

[8] As noted above in footnote 5, the current Evidence Code carried forward former OCGA § 24-3-50 as OCGA § 24-8-824, and the provisions are materially the same.

his cooperation. Specifically, during the April 24 three-way phone call from jail, Detective Demeester told Lewis that, had he cooperated earlier, he "wouldn't be in this situation right now." And the next day, after Lewis told his sister that the district attorney was not offering a plea deal, Detective Demeester interjected that he was "not saying that [Lewis's cooperation] can't help in any way," and that although he could not get Lewis released from jail that night, if Lewis were "honest and truthful and telling me everything that happened," Lewis's attorney could "hopefully use" it "to assist [Lewis] in the future." Additionally, when Lewis's sister asked whether the State was dropping the murder charges against Lewis, Detective Demeester responded, "[n]ot right now . . . because I've only got one side of the story. I don't have [Lewis's] side of the story."

Under OCGA § 24-8-824, a confession is admissible if it is "made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." The phrase "slightest hope of benefit" is not to be understood "in the colloquial sense" but instead "as it is understood in the context within the

17

statute." *Budhani v. State*, 306 Ga. 315, 325 (830 SE2d 195) (2019) (citation and punctuation omitted). We have explained that the phrase "refers to promises related to reduced criminal punishment—a shorter sentence, lesser charges, or no charges at all." Id. (citations and punctuation omitted). Such promises are distinct from "exhortations or encouragement to tell the truth, conveying the seriousness of the accused's situation, or offering to inform the district attorney about the accused's cooperation while making clear that only the district attorney can determine charges and plea deals," which do not constitute a hope of benefit. Id.; see also *Huff v. State*, 299 Ga. 801, 803 (792 SE2d 368) (2016) ("Encouragement or admonitions to tell the truth will not invalidate a confession."). Furthermore, showing that law enforcement officials impermissibly promised a hope of benefit does not, on its own, render a confession inadmissible; a defendant must also establish that the hope of benefit "induced" his confession. See OCGA § 24-8-824; *Kessler v. State*, __ Ga. __, Case No. S21A0066 (decided May 3, 2021); *Budhani*, 306 Ga. at 326.

18

Here, even assuming—without deciding—that Detective Demeester's statements to Lewis on April 24 and 25 constituted an impermissible hope of benefit, Lewis has failed to demonstrate that the statements induced his April 25 confession. Indeed, the record shows that Lewis confessed despite knowing that no benefit would ensue: on April 25, Lewis told his sister that "the DA didn't say anything about like trying to help me out or whatever, but I know it's—it's the right thing to do it anyway." Where, as here, the record shows that Lewis elected to speak with law enforcement officers because "it's the right thing to do," even after he acknowledged that law enforcement officers had not said they would "help [him] out," we cannot say that his confession was induced by a hope of benefit. See *Kessler*, __ Ga. at __ (confession was not induced by improper hope of benefit where the defendant testified that he confessed because of religious reasons). Therefore, the trial court did not err under OCGA § 24-8-824 when it admitted Lewis's April 25 confession.

(b)  *Right to Counsel Claim*

19

Lewis argues that the confession he gave during the April 25

custodial interview was obtained in violation of his right to counsel

under the Fifth Amendment to the United States Constitution.[9] To

succeed on this claim, he necessarily must show that he invoked his

Fifth Amendment right to counsel.  To that end, Lewis appears to

assume on appeal that he invoked his right to counsel during the

---

[9] Lewis also contends that the State violated his right to "have the [a]ssistance of [c]ounsel for his defense" under the Sixth Amendment to the United States Constitution.  Among other reasons, his argument fails because the Sixth Amendment right to counsel "attaches only at the initiation of adversary criminal proceedings," and Lewis does not point to any such initiation here. *Clements v. State*, 301 Ga. 267, 269-270 (800 SE2d 552) (2017) ("Before judicial proceedings are initiated[,] a suspect in a criminal investigation has no constitutional right to the assistance of counsel.") (citation and punctuation omitted).  Indeed, Lewis does not point to anything between the April 19, 2011 issuance of his arrest warrant and the April 24 and 25 statements he made to Detective Demeester that could constitute "the initiation of adversary criminal proceedings" relating to the Gault Street crimes.  See id.; *Rackoff v. State*, 281 Ga. 306, 308 (637 SE2d 706) (2006) (stating that "the [Sixth Amendment] right to counsel does not attach automatically upon arrest").  See also *Outlaw v. State*, ___ Ga. ___ n.6, Case No. S21A0305 (decided May 3, 2021).  Moreover, a defendant's Sixth Amendment right to counsel is offense-specific, meaning that "even if the right to counsel has attached to one offense for which the defendant has been charged, it does not attach to even a factually-related separate offense for which the defendant has not been charged." *Chenoweth v. State*, 281 Ga. 7, 9 (635 SE2d 730) (2006); see also *McNeil v. Wisconsin*, 501 U.S. 171, 175 (111 SCt 2204, 115 LE2d 158) (1991).  As applied here, that means that even to the extent Lewis's Sixth Amendment right to counsel had attached with respect to the unrelated crimes for which he was indicted on April 8, 2011, they did not attach with respect to the crimes at issue in this appeal.

April 24 three-way phone call from jail. He then contends that he did not later waive that invocation and that Detective Demeester did not honor Lewis's right to counsel on April 25. As a result, he claims that even if he initiated an interview with Detective Demeester on the day after the three-way phone call, any statements Lewis made during the custodial interview were the product of a past violation of his previously invoked right to counsel and were therefore inadmissible. See *Mack v. State*, 296 Ga. 239, 246, 248 (765 SE2d 896) (2014). For the reasons explained below, we conclude that Lewis has not shown that he clearly and unambiguously invoked his Fifth Amendment right to counsel, and therefore conclude that the trial court did not err by admitting the recording of his April 25 custodial interview into evidence.

If a suspect asks for a lawyer during a custodial interrogation, law enforcement officers may not continue questioning the suspect "until an attorney has been made available or until the suspect reinitiates the conversation." *Driver v. State*, 307 Ga. 644, 646 (837 SE2d 802) (2020) (citation and punctuation omitted). See also

*Edwards v. Arizona*, 451 U.S. 477, 484-486 (101 SCt 1880, 68 LE2d 378) (1981). "A request for a lawyer must be clear and unambiguous; the mere mention of the word 'attorney' or 'lawyer[,]' without more, does not automatically invoke the right to counsel." *Taylor v. State*, 304 Ga. 41, 48 (816 SE2d 17) (2018) (citation and punctuation omitted). This standard requires a suspect to "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Dozier v. State*, 306 Ga. 29, 35 (829 SE2d 131) (2019) (citation and punctuation omitted). As a result, "ambiguous or equivocal" statements that a reasonable officer in light of the circumstances would have understood "only that the suspect *might* be invoking the right to counsel" are not enough, *Taylor*, 304 Ga. at 48 (emphasis in original), and "even a comment that a suspect would like counsel to be present in the future is not a clear and unambiguous request for counsel," *Dozier*, 306 Ga. at 35 (citation and punctuation omitted). Moreover, a law enforcement officer who conducts a custodial interrogation need not clarify "an

22

equivocal reference to counsel." *Golden v. State*, __ Ga. ___ (852 SE2d 524, 531) (2020).

Pretermitting whether Lewis preserved his Fifth Amendment right-to-counsel claim for ordinary appellate review, we conclude that Lewis did not invoke his right to counsel unequivocally during the April 24 three-way call. The audio recording of that call contains two statements that arguably come close to invoking Lewis's right to counsel. First, after Lewis offered to assist investigators the next day ("y'all can come get me tomorrow") and Detective Demeester followed up with specific questions about the Gault Street crimes, Lewis asked: "If I reach out to my attorney tomorrow and tell them that I want to talk to you, and tell them to come up with some kind of deal, can that work Detective Demeester?" And second, in response to Detective Demeester's question, "Would you want to talk to me without your attorney?" Lewis responded, "I would talk to you without my attorney, if that's what the attorney said, yes."

But neither statement constituted a "clear and unambiguous" invocation of Lewis's Fifth Amendment right to counsel. *Taylor*, 304

23

Ga. at 48. To the contrary, Lewis's first statement—which began with "If I reach out to my attorney *tomorrow*"—reflects a desire to speak with counsel at a future point in time, as opposed to a request to have counsel present during the April 24 three-way phone call, and it is well established that "a comment that a suspect would like counsel to be present in the future is not a clear and unambiguous request for counsel." *Dozier*, 306 Ga. at 35 (citation and punctuation omitted). See also *Luallen v. State*, 266 Ga. 174, 177-178 (465 SE2d 672) (1996) (holding that a suspect's statement that she would "talk to [her] lawyer tomorrow" was not a clear invocation of her right to counsel and instead "indicated solely that she *might* invoke the right to counsel at a later time") (emphasis in original), overruled in part on other grounds, as recognized in *Clark v. State*, 271 Ga. 6, 10 (515 SE2d 155) (1999); *Lee v. State*, 306 Ga. 663, 668 (832 SE2d 851) (2019) (noting that "future-oriented references to obtaining counsel"—such as "It ain't gonna be too much more different from when my lawyer get here" and "Can I just wait until I get a lawyer?"—"are not clear requests for an attorney that require law

24

enforcement officers to immediately end an interview"); *Kirby v. State*, 304 Ga. 472, 475-476 (819 SE2d 468) (2018) (holding that a defendant's statement "I'm going to go ahead and get a lawyer" was not an unequivocal request to have counsel present during interrogation because it was future-oriented); *Moore v. State*, 272 Ga. 359, 360 (528 SE2d 793) (2000) (holding that defendant's statement that "[a]s far as anything in detail, I'd like to talk to [unintelligible] as far as who the public defender, or whoever my attorney is going to be" was not a clear and unambiguous request for counsel). Compare *Robinson v. State*, 286 Ga. 42, 45 (684 SE2d 863) (2009) ("There was no ambiguity or equivocation in [defendant's] statement: 'Uhm, yeah, I would like a lawyer.'"); *Allen v. State*, 259 Ga. 63, 65-66 (377 SE2d 150) (1989) (holding that the statement "I'll talk to you after I've talked to my lawyer" "could not have been clearer or less equivocal"). And Lewis's second statement—that he would talk to Detective Demeester "without my attorney, if that's what the attorney said, yes"—likewise suggests that Lewis might contact an attorney at a future point in time, as opposed to

25

expressing an unequivocal desire for counsel to be present during the April 24 phone call. See, e.g., *Dozier*, 306 Ga. at 35-36; *Luallen*, 266 Ga. at 178.

Especially "when viewed in context," *Brooks v. State*, 271 Ga. 698, 699 (523 SE2d 866) (1999), we cannot say that a reasonable officer under the circumstances would have interpreted Lewis's statements to be "clear and unambiguous" expressions of a desire to have counsel present during his April 24 phone call from jail, *Taylor*, 304 Ga. at 48. That context includes Lewis initiating the phone call with his sister and Detective Demeester; Lewis's persistence in offering to speak with Detective Demeester and to assist in the investigation; and Lewis's failure to articulate a clear desire for counsel to be present during the call, even after Detective Demeester acknowledged that Lewis was represented by counsel and explained that he had spoken with a separate attorney who suggested that he would advise Lewis against speaking to Detective Demeester if Lewis were, in fact, his client.

Because Lewis did not clearly and unambiguously invoke his

26

Fifth Amendment right to counsel during the April 24 three-way phone call from jail, Lewis's April 25 custodial interview—during which he was advised of and waived his rights under *Miranda* and then confessed to his role in the Gault Street crimes without ever requesting a lawyer—was not the product of a violation of Lewis's right to counsel, and the trial court did not err by admitting it into evidence. See, e.g., *Dozier*, 306 Ga. at 35-36; *Luallen*, 266 Ga. at 178.

3. Lewis contends that his trial counsel rendered ineffective assistance by failing to object when the trial court declined the jury's request to explain a jury instruction the court had already provided. We conclude that Lewis's claim fails because he has failed to show that his counsel was constitutionally deficient.

During the jury charge, the trial court instructed the jurors that, among other things, they would need to determine whether the statements made during Lewis's April 25 custodial interview were voluntary:

> To be voluntary, a statement must be free and willingly given without coercion, duress, threats, use of violence, fear of injury, or any suggestions or promises of leniency

27

or reward. A statement induced by the slightest hope of benefit or the remotest fear of injury is not voluntary. To be voluntary, a statement must be the product of a free will and not under compulsion or any necessity imposed by others.

While the jury was deliberating, the jurors sent the following question to the trial court: "[W]e cannot come to an agreement on whether or not the defendant's statement was given voluntarily or involuntarily. Is it possible for us to receive a concise explanation of the two, particularly suggestion or promise of leniency or reward?" The court told Lewis's trial counsel that it would tell the jurors that it had already instructed them on all of the applicable law, and that it could do so either in writing or by bringing the jurors out and telling them in person. Lewis's counsel responded that he did not believe the court could "do anything more than tell them what you've already told them." The court then responded to the jurors in writing, "You have been given all the applicable law."

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to

the defendant.  See *Strickland v. Washington*, 466 U.S. 668, 687-695

(104 SCt 2052, 80 LE2d 674) (1984).  To satisfy the deficiency prong,

a defendant must demonstrate that his attorney "performed at trial

in an objectively unreasonable way considering all the

circumstances and in the light of prevailing professional norms."

*Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013).  This

requires a defendant to overcome the "strong presumption" that trial

counsel's performance was adequate.  See *Strickland*, 466 U.S. at

689; *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015).  To

satisfy the prejudice prong, a defendant must establish a reasonable

probability that, in the absence of counsel's deficient performance,

the result of the trial would have been different.  *Strickland*, 466

U.S. at 694.  "A reasonable probability is a probability sufficient to

undermine confidence in the outcome."  Id.  For the reasons

explained below, because Lewis has failed to show deficient

performance, his claim of ineffective assistance fails.

Lewis has failed to establish that his counsel's failure to object

to the trial court's response to the jury question was "objectively

unreasonable." *Romer*, 293 Ga. at 344. To that end, our precedent holds that because "[t]he need, breadth, and formation of additional jury instructions are left to the sound discretion of the trial court," a "trial court ha[s] discretion to decline to answer the jury's question directly, and instead to direct the jurors to rely on instructions previously given." *Stepp-McCommons v. State*, 309 Ga. 400, 405-407 (845 SE2d 643) (2020) (rejecting appellant's claim that trial counsel was ineffective for failing to object when the jury asked "[d]oes the definition of causing for death, close quote, in felony murder include both direct and indirect causes?" and the trial court responded, "[y]ou have been given the necessary definition in the charge; please continue") (citations and punctuation omitted); *Redding v. State*, 296 Ga. 471, 473 (769 SE2d 67) (2015) (rejecting appellant's claim that the trial court plainly erred when it directed the jury to its prior instructions and the indictment in response to the question, "[d]oes the defendant have to be the person who actually committed the act[,] or can he be party to a group that committed the act," because "[t]he trial court had discretion to decline to answer the jury's

30

question directly").

Here, the trial court exercised its discretion in "recharging" the jurors by referring them to the pattern instructions it had already provided and by declining to try to explain further the phrase "suggestions or promises of leniency or reward," which was contained in that pattern charge.[10]  Lewis therefore has not shown that trial counsel's failure to object to the trial court's proposed response to the jury question was "objectively unreasonable" considering "all the circumstances and in the light of prevailing professional norms," see *Romer*, 293 Ga. at 344, nor has he overcome

_____

[10] Moreover, Lewis's case is distinguishable from other cases in which this Court has identified reversible error with respect to a jury's request for a recharge.  See, e.g., *Dill v. State*, 277 Ga. 150, 151-152 (587 SE2d 56) (2003) (holding that the trial court committed reversible error when it responded to the jury's request for a definition of malice murder but altogether refused to respond to a jury question relating to "the issues of presence and knowledge"); *Glisson v. Glisson*, 268 Ga. 164, 164 (486 SE2d 167) (1997) (holding that, under the circumstances of that case, the trial court committed reversible error when it declined to recharge the jury and referred the jury to its previous charge after the jury asked, "when you read about a person reading and signing a paper, didn't you say there was an exception between family members?" and "didn't you read something like 'if there is any deception—to rule fraud,'" noting that "[m]erely sending a message to the jury to consider the instructions previously given may be insufficient under the circumstances," and concluding that the requested recharge "demonstrated the jurors' lack of comprehension" about key legal concepts at issue in that case) (citation and punctuation omitted) (emphasis supplied).

31

the "strong presumption" that trial counsel's performance was adequate, see *Strickland*, 466 U.S. at 689. See also *Ivey v. State*, 305 Ga. 156, 162 (824 SE2d 242) (2019) (holding that the failure to raise a meritless objection is not deficient performance). His claim of ineffective assistance fails as a result. See *Stepp-McCommons*, 309 Ga. at 406.

4. Lewis contends that the trial court erred when it gave the following jury instruction on corroborating the testimony of an accomplice:

> The [testimony] of a single witness, if believed, is sufficient to establish a fact. Generally there is no legal requirement of corroboration of a witness, provided you find that the evidence is sufficient. An exception to this rule is made in the case of felony *murder* where the witness is an accomplice. The testimony of the accomplice alone is not sufficient to warrant a conviction. The accomplice's testimony must be supported by other evidence of some type, and that evidence must be such as would lead to the inference of the guilt of the accused independent of the testimony of the accomplice.

(Emphasis supplied). But because Lewis did not object to this instruction at trial (a fact he concedes on appeal), we review his enumeration for plain error only. See *Doyle v. State*, 307 Ga. 609,

32

611 (837 SE2d 833) (2020).

> For an appellant to establish plain error,
>
> [f]irst, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error— discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Kelly*, 290 Ga. 29, 33 (718 SE2d 232) (2011) (citation and punctuation omitted) (emphasis in original). Moreover, "[t]o prevail on this argument requires [appellant] affirmatively to establish all four prongs of the plain error test, which is a difficult standard to satisfy." *Stepp-McCommons*, 309 Ga. at 405. That means that Lewis cannot prevail if he fails to meet even one element of the plain-error test. See *Denson v. State*, 307 Ga. 545, 548 (837 SE2d 261) (2019).

33

In most instances, the testimony of a single witness is sufficient to establish a fact under Georgia law.  But that is not so in "felony cases where the only witness is an accomplice."  OCGA § 24-14-8.  In felony cases, the accomplice's testimony must be corroborated by evidence that is "independent of the accomplice testimony" and that "directly connect[s] the defendant with the crime or lead[s] to the inference that he is guilty," *Dozier*, 307 Ga. at 586.

Lewis argues that the trial court's jury instruction erroneously stated that the accomplice-corroboration requirement applied only to felony murder, rather than to all felonies, and that the instruction prejudiced the outcome of his trial by impermissibly authorizing the jury to find him guilty on multiple felony counts on the basis of Richardson's testimony alone.  But even assuming that the trial court's instruction constituted a "clear" error not "subject to reasonable dispute," Lewis's claim fails because he cannot show that the alleged error "affected the outcome of the trial court proceedings."  *Kelly*, 290 Ga. at 33 (citation and punctuation

34

omitted).  Indeed, even if the trial court had correctly instructed the jury that it was required to corroborate an accomplice's testimony for *all* felony charges, the State presented a substantial amount of other evidence that corroborated Richardson's account— corroborating evidence the jury was authorized to consider in finding Lewis guilty of all of the felony counts at issue, including the counts of criminal attempt to commit armed robbery, aggravated assault, and possession of a firearm during the commission of a felony.  Specifically, Richardson's testimony was corroborated by Lewis's April 25, 2011 confession, in which he detailed his involvement in the armed robbery.  It was also corroborated by Danielle Parks, who testified that on March 25, 2011, she drove Patterson to the Doo Drop Inn to meet up with Lewis; that Patterson and Lewis were on the phone; and that after she dropped Patterson off, he entered a Nissan Altima driven by Lewis.  And it was corroborated by evidence of Lewis's fingerprints found inside and outside the Nissan Altima; his text message about still having the bullet proof vest; and the cell-site data indicating that his phone was

in the vicinity of the Gault Street house at the relevant time and date.  Moreover, the jury also found Lewis guilty of the most serious charge, felony murder, and it is not disputed that the jury was correctly instructed on accomplice corroboration on that count.

As a result, even though the trial court did not give the accomplice-corroboration instruction as to the non-felony murder counts, the State introduced a substantial amount of evidence that corroborated Richardson's testimony as to those counts, making it unlikely that the instructional error at issue here affected the outcome of Lewis's trial.  See *Kelly*, 290 Ga. at 33.  His claim of plain error therefore fails.[11]  See, e.g., *Lyman v. State*, 301 Ga. 312, 318-320 (800 SE2d 333) (2017) (holding that, although the trial court's complete failure to provide the accomplice-corroboration instruction

---

[11] Lewis also claims that his trial counsel provided ineffective assistance for failing to object to the accomplice-corroboration jury instruction.  However, as we have said repeatedly, the "test for harm under plain error review is equivalent to the test in ineffective assistance of counsel cases for whether an attorney's deficient performance has resulted in prejudice of constitutional proportions."  *Martin v. State*, 298 Ga. 259, 278 (779 SE2d 342) (2015), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 n.3 (820 SE2d 640) (2018).  As a result, because Lewis has failed to show prejudice, his ineffective assistance claim also fails.

was a "clear error," the appellant's claim failed under plain-error review because he could not establish that the error affected the outcome of his trial). Compare *Pindling v. State*, ___ Ga. ___, Case No. S21A0084 (decided April 5, 2021) (trial court plainly erred in failing to give the accomplice-corroboration instruction where "almost all of the evidence incriminating" the defendant came from an accomplice).

*Judgment affirmed. All the Justices concur, except LaGrua, J., disqualified.*