### JOHNSON *vs.* THE STATE OF GEORGIA.

1. The second marriage of a bigamist is void, and does not render the woman incompetent to testify against him on a criminal trial.
2. A witness may be impeached by proof of general bad character, but not by special acts of adultery.
3. Statements made by a prisoner, in the nature of confessions, such as a declaration of intention to tell the truth about the matter, an inquiry as to his power to turn state's evidence, and the like, though not direct confessions, were inadmissible on his trial for the offense spoken of, it appearing that the witness to whom they were made, told him that if he turned state's evidence, and there were others implicated and he could prove it, he would "get clear."
4. The verdict was unsupported by the evidence.

BLECKLEY, Justice, dissented.

Criminal law. Witness. Evidence. New trial. Before Judge HARRIS. Ware Superior Court. March Term, 1878.

Reported in the decision.

JNO. C. NICHOLLS, for plaintiff in error.

R. N. ELY, attorney general; SIMON W. HITCH, solicitor general; MERSHON & SMITH, for the state, cited as follows: Evidence of second wife admissible, Code, §3852; 1 Phil. on Ev., 3, 4, 5, and notes; 11 *Ga.*, 353; Wharton's Crim. L., 681. On impeachment of witnesses, 30 *Ga.*, 888; 3 *Ib.*. 417; 1 Wharton's Crim. L., 814.

WARNER, Chief Justice.

The defendant was indicted for the offense of murder, and charged with the unlawful killing of Elias F. Sweat, in

the county of Ware, and on his trial therefor was found guilty.   A motion for a new trial was made on the several grounds therein set forth, which was overruled, and the defendant excepted.

It appears from the record and bill of exceptions, that Matilda Johnson was offered as a witness for the state, who stated that she was the wife of the defendant, was married to him by Isaac Highsmith since the war; whereupon the defendant objected to her testifying in the case.   The counsel for the state replied that the defendant's marriage with Matilda was void, because he had another lawful wife living at the time of his marriage with her, and proposed to prove that fact, which the court allowed to be done.   It was proved by several witnesses, that the defendant, at the close of the war, and for three or four years afterwards, lived with another woman by the name of Rose Johnson, who he claimed to be his wife, by whom he had six children.   The court allowed Matilda to testify against the defendant, over his objections, and that is one of the errors complained of.

1.  By the act of 9th of March, 1866, (Code, §1667,) it is declared that persons of color living together on the said 9th day of March, 1866, as husband and wife, shall sustain that legal relation to each other, and it having been clearly proved that the defendant and Rose Johnson were living together as husband and wife on the 9th of March, 1866, and for three or four years afterwards, his subsequent marriage with Matilda Johnson was void, and therefore she was a competent witness.   Although the defendant must be presumed to have known the law when he was married to Matilda, still, I cannot but feel (knowing that class of our population as well as I do,) that he was not aware that he was in fact violating it, and that he considered Matilda his only lawful wife, and communicated with her as such.   Be that as it may, I am bound to administer the laws of the land as I find them, and consequently to hold that the court did not err in hearing the evidence as to the defendant living with Rose Johnson and claiming her as his wife, as set forth in

the record, and in allowing Matilda Johnson to testify as a witness in behalf of the state against the defendant.

2. There was no error in ruling out the testimony of Winter Nesbit, a witness offered by the defendant, to prove that just previous to the homicide, Matilda Johnson and Lewis Phillips, another witness for the state, were in the habit of committing acts of adultery together. It would have been competent to have proved their general character, but not specific acts of adultery for the purpose of impeaching them.

3. It appears from the bill of exceptions, that E. H. Crawly, a witness for the state, testified to a conversation had with the defendant when in jail, from which conversation unfavorable inferences might be drawn prejudicial to the defendant, though not amounting to a direct confession, the defendant having sent for the witness. Upon his cross examination, the witness said, "I told defendant, of course if he turned state's evidence, and there were others implicated, and he could prove it, that he would get clear." The defendant made a motion to rule out the evidence of Crawly, on the ground that the statements of the defendant as testified to by him were made under the hope of being benefited thereby. The court overruled the motion, and that is assigned as error. The 3793d section of the Code declares, that "to make a confession admissible, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit, or remotest fear of injury." According to this rule, the only part of Crawly's evidence that was admissible was the following: "Defendant sent for me about the murder of Elias Sweat, that was what we were talking about," and the court erred in not ruling out the other part of his evidence.

4. It appears from the evidence in the record, that Mr. Sweat, the deceased, was killed near his own house, about twelve o'clock at night, by blows inflicted upon his head which caused his death. The only evidence which connects the defendant with the killing of the deceased was his con-

fession, as testified to by one King, who was confined in jail with defendant under a charge of stealing. According to King's evidence, defendant said to him that " Sweat was keeping his wife, and he killed him with a hatchet, and got $17.00 from the person of deceased." It appears from the evidence of Sydboten, the jailor, that Farly Sweat had a talk with King outside of the jail, and told him, King, " that if he would get it (the confession) out of defendant, he would pay him for it, and he thought there would be a chance to get him out of jail." When King told the witness one day that " he had got it all out of defendant," the witness proposed to him to get Dr. Lott, Dr. Folks, and other prominent men, and take them into the jail, and for King to make his statement of what the defendant had said to him in his presence. King said " he could not do that as he was afraid to be left in there with the defendant." The defendant was chained in the jail to prevent his escape. Besides, the general character of King was impeached by two witnesses who were acquainted with it, and proven to be bad, and that they would not believe him on his oath. This is the evidence of the defendant's confession on which the defendant's conviction is sought to be established. The 3792 section of the Code declares, that " all admissions should be scanned with care, and confessions of guilt should be received with great caution. A confession alone, uncorroborated by other evidence, will not justify a conviction." What is the other evidence in the record to corroborate the confession made to King? It is the evidence of Lewis Phillips and Matilda Johnson. Phillips testified that defendant said to him " that if deceased did not mind he would smash his brains out." Matilda Johnson testified that defendant said " he did not think she ought to belong to any church, that he intended to burst deceased's head open, intended to spill blood that could not be scoured up, etc." This witness admitted her feelings were not good towards defendant, as she could not go anywhere night nor day, but he was there. The general character of both of

these witnesses was proven to be bad, and not worthy of be-
lief on their respective oaths. There is one significant fact
disclosed by the evidence in the record, and that is, that
notwithstanding every one of the witnesses mainly relied
on by the state for a conviction of the defendant were im-
peached, as being of bad character, no attempt was made
by the state to sustain or support the character of its own
witnesses who were thus attacked. So that there was no
*conflict* in the evidence as to their bad character. If we
scan with care and caution the evidence of the confession
testified to by King, and the evidence of the previous threats
made by the defendant in corroboration thereof, as testified
to by Phillips and Matilda Johnson, as the law enjoins us
to do, especially in regard to that class of our population
to which the defendant belongs, it cannot with legal pro-
priety be judicially declared that the evidence in the record
is of such a character as to *require* a verdict of guilty
against the defendant, notwithstanding the error of the
court in not ruling out the evidence of Crawly, as herein-
before indicated, and inasmuch as the court erred in re-
fusing to rule out that evidence, a new trial should be
granted. In the view we have taken of this case, the rul-
ing out of the testimony of Nicholls, becomes immaterial.

Let the judgment of the court below be reversed, and a
new trial granted.

JACKSON, Justice, concurred.

BLECKLEY, Justice, dissenting.

1. A witness for the state having testified as follows, there
was no error in refusing to rule out his evidence on the
prisoner's motion : "defendant asked me if he could turn
state's evidence. Told him he could if there were more
than himself implicated in the crime. Defendant went on
talking a good deal. I told him he must tell me the truth
in this matter, and I would come next morning and bring a
justice of the peace. Defendant then asked me if he could

not tell it then.    I told him no, he had better tell it before a justice of the peace, or some legal officer to take his testimony down.    He asked me if I would be sure and come next morning.    I told him I would if nothing providential occurred.    I came back next morning, and he said he would have to see Col. Nichols before he done anything.    At the time of conversation he was kind of sitting or leaning on the floor, with his face in his hands, and every now and then he would raise up and talk to me.    He sent for me about the murder of Elias Sweat.    That's what we were talking about.    *Cross.*—I told defendant, of course, if he turned state's evidence, and there were others implicated, and he could prove it, that he would get clear."    Here nothing is *repeated* as coming from the prisoner, except three questions, and the final remark as to seeing Col. Nichols. The competency of this testimony was not affected by any hope excited by the witness in the mind of the prisoner; for, first, the prisoner took the initiative; he sent for the witness to talk to him about the murder, and when he came, inquired of him whether he, the prisoner, could turn state's evidence.    In this question, which was doubtless propounded *before* the witness mentioned any favorable consequence as likely to follow, lies the chief potency of the whole testimony of this witness.    The free and voluntary asking of such a question, with the deliberation implied in sending beforehand for a person to hear and answer it, is a weighty circumstance in the investigation of a secret murder.    Secondly, whatever hope may have been inspired was barren of results; it induced no confession; no confession was made.    The prisoner was checked for the time by the witness.    An interview was appointed for the next day, and when the witness returned, the prisoner announced his wish to consult Col. Nichols, and there the matter ended.    So far from making any disclosure under the encouragement held out by the witness, the prisoner reconsidered his purpose and abandoned it.    His hope, if any hope was kindled, emitted silence, not criminating speech.    If he had any secret to impart, he declined to impart it.    27 *Ga.*, 640.

2. While this court may pronounce witnesses whom the jury trusted, unworthy of credit for sufficient cause apparent in the record, the mere absence of supporting witnesses to offset impeaching evidence on the ground of general bad character, is not cause sufficient. 22 *Ga.*, 479.

3. The second wife of a bigamist is no wife in law, and therefore not incompetent as a witness against him. 1 Phil. Ev., 84; Roscoe Cr. Ev., 147.

4. The court (as I think) committed no error on the trial, or in overruling the motion for a new trial.