320 Ga. 806
FINAL COPY

S24A0984. THE STATE v. LEVERETTE.

COLVIN, Justice.

The State appeals from the trial court's order granting Jaylen Leverette's motion to suppress incriminating statements he made during an audio-recorded, custodial interview. The trial court excluded Leverette's statements under OCGA § 24-8-824, which provides in relevant part that a confession is inadmissible if it was "induced by another by the slightest hope of benefit." As explained below, however, we conclude that the trial court erred in concluding that law enforcement officers made statements during the interview that offered a hope of a benefit under OCGA § 24-8-824. Accordingly, we vacate the trial court's order and remand for the court to consider in the first instance Leverette's other asserted grounds for excluding his statements.

1. On February 25, 2019, a Sumter County grand jury returned an eight-count indictment against Leverette, Patrick Etheridge,

Christopher Hale, Jr., and Christopher Hale, Sr., charging each defendant with one count of aggravated assault and one count of felony murder. In brief, the indictment alleged that, on August 1, 2018, Etheridge drove Leverette to the home of Hale, Sr., where Leverette fired shots into the home, initiating an exchange of gunfire in which Hale, Sr., or Hale, Jr., killed a bystander, Jarvis Willis, while shooting at Etheridge and Leverette's fleeing vehicle.

On September 15, 2023, Leverette filed a pretrial motion to suppress custodial statements he had made to a GBI agent on August 9, 2018. In the motion, Leverette argued that the statements were inadmissible under OCGA § 24-8-824, the Georgia Constitution, the United States Constitution, and several United States Supreme Court precedents.

During a *Jackson-Denno*[1] hearing on November 21, 2023, the audio recording of Leverette's custodial interview was admitted into evidence. During the first hour and 19 minutes of the interview, which was conducted by GBI Agent Clint Karsten, Leverette waived

---

[1] See *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

2

his *Miranda*[2] rights and said that he had heard about the shooting. But he said that he did not know why other people were saying that he was involved in the shooting, and he denied having ever gone to the location where the shooting occurred.

Major Ralph Stuart entered the room an hour and 20 minutes into the interview and spoke with Leverette for approximately 11 minutes before leaving. The audio recording of that 11-minute period, which was the focus of Leverette's motion to suppress, showed the following. Major Stuart told Leverette that they could track the location of Leverette's phone within three feet of where he was. He then told Leverette three times that officers did not believe that Leverette had fired the bullet that killed the bystander, saying: "Y'all haven't been accused . . . of firing the shots that killed a man. I think you need to understand that. Okay? That's not why we're here"; "Nobody thinks for one minute that car that the shots was fired from killed an innocent person, and I want to make that clear";

---

[2] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

and "The good news in your corner is you're not being accused, or nobody in that car is being accused, of the bullet hitting that man that died."

Major Stuart then told Leverette that the agents already knew what the truth was, and that "[n]ot telling the truth of what actually happened is going to cause you a lot more trouble than telling the truth." Major Stuart asked Leverette, "Do you want to tell this agent the truth or do you want to go ahead . . . with what you got? 'Cause what you got is going to drown you." Then, Major Stuart said Leverette's friends and his phone were going to "give [him] up," told Leverette that they "already kn[e]w what car [he] was in," and asked Leverette if he had ever been in Etheridge's car before.

Major Stuart went on to discuss how telling the truth would make Leverette feel and the potential impact on his reputation. He said: "That little bad feeling you've got in your stomach right now, it can get a lot better just as soon as you tell that man the truth," or "it's fixing to get a lot worse"; "Now you can get rid of that little uneasy feeling in your stomach right now and tell him what he

4

already knows or you're going to make it worse"; "Do you want to look like you're an honest person or do you want to look like you're a liar?"; and "You can walk out that door with a little bit better feeling in your stomach, not be so queasy, after you tell him the truth or that little feeling in your stomach is going to come back."

Shortly after, Major Stuart informed Leverette that his friends had already given him up, and that Leverette's phone was going to verify what they said. Major Stuart further said that Leverette had made a big mistake by lying, and that the agent was giving him a chance to "take it back." Major Stuart then told Leverette, "We want to hold the man accountable that fired the round, not nobody in the car. [Hale, Sr., has] been held accountable, him and his son. . . . That's what we're here for." Major Stuart asked Leverette if he "want[ed] to tell [the agent] the truth about being in the car." And he emphasized again that they did not believe Leverette had shot the bystander, saying, "We know that nobody in the car even shot the innocent bystander, much less you."

Major Stuart also made several statements indicating that

5

Leverette was going to get himself into more trouble by lying than by telling the truth, saying: "You're not important, but you fixing to make yourself important"; "So you want to sit here and stick to this stupid story and make you look like a fool and get held more accountable for the lie you're telling now than the one we was asking you about"; and "your story makes you look like you guilty of something."

After Major Stuart left the interview room, Agent Karsten stated, "We don't think people in the car shot the person that died." And Leverette then made several incriminating statements to Agent Karsten, admitting that he and Etheridge were present for the shooting, that there was an exchange of gunfire, and that Leverette had fired a gun toward the house from the passenger seat of the vehicle.

The trial court granted Leverette's motion to suppress his statements under OCGA § 24-8-824, finding that, although Leverette's confession had not resulted from a fear of injury,

"Leverette confessed under a clear hope of benefit."[3] The court found

that

> [Major] Stuart made several statements to Leverette that
> he and Eth[e]ridge were not accused of firing the shots
> that killed the victim and that he could "make things
> worse" by not speaking up about being at the scene. . . .
> [Major] Stuart told Leverette he could "walk out that
> door" feeling better about the situation if he admitted his
> involvement. Finally, [Major] Stuart made several
> statements to the defendant that the occupants of the car
> were not facing responsibility for the shooting. For
> example, [Major] Stuart stated we "want to hold the man
> accountable that fired the round . . . *not nobody in the
> car*."

(Emphasis in original.) According to the trial court, these

statements constituted "assurances" that Leverette "would not be

charged with offenses holding him 'responsible' for the fatal

shooting." And the court found that these assurances persuaded

Leverette to admit his involvement in the shooting. The State timely

appealed.

2. On appeal, the State contends that the trial court erred in

---

[3] The trial court's finding that Leverette's confession was not induced by fear of injury under OCGA § 24-8-824 has not been challenged on appeal. Accordingly, we do not address that finding.

7

concluding that Major Stuart offered Leverette a "hope of benefit" under OCGA § 24-8-824, as that phrase has been defined in our case law. We agree.

Georgia law provides that, "[t]o make a confession admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-8-824. We have held that "[t]he phrase 'slightest hope of benefit' is not to be understood in the colloquial sense," and that the phrase instead "refers to promises related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." *Lewis v. State*, 311 Ga. 650, 658 (2) (a) (859 SE2d 1) (2021) (citations and punctuation omitted).

A court must consider "the totality of the circumstances" in determining whether the defendant's statement is admissible under OCGA § 24-8-824. *Henderson v. State*, 310 Ga. 708, 710 (2) (854 SE2d 523) (2021) (citation and punctuation omitted). And we review a trial court's decision regarding the admissibility of a defendant's statements de novo where, as here, "the controlling facts can be

definitively ascertained, exclusively by reference to evidence, such as a recording of a police interview, that is uncontradicted and presents no questions of credibility." *Torres v. State*, 314 Ga. 838, 851 (2) (e) (iii) (878 SE2d 453) (2022) (citation and punctuation omitted). See also *State v. Franklin*, 318 Ga. 39, 39 (1) & n.1 (897 SE2d 432) (2024) (explaining that an appellate court may not resolve factual disputes, but that an appellate court may rely on undisputed facts that "definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility," and that "[a]udio or video evidence may match that description" (citation and punctuation omitted)).

Here, the trial court erred in concluding that Major Stuart gave Leverette assurances that he would not be charged with murder if he spoke to law enforcement officers about the shooting and thus erred in concluding that Leverette's admissions were induced by a hope of benefit under OCGA § 24-8-824. In reaching its conclusion, the trial court focused on three categories of comments made by Major Stuart. But our precedent makes clear that none of those

9

comments constituted an impermissible hope of benefit under OCGA § 24-8-824, that is, a "promise[ ] related to reduced criminal punishment — a shorter sentence, lesser charges, or no charges at all." *Lewis*, 311 Ga. at 658 (2) (a) (citation and punctuation omitted).

First, the trial court focused on comments made by Major Stuart that indicated Leverette would make things worse by not telling the truth. These comments included statements that: "Not telling the truth of what actually happened is going to cause you a lot more trouble than telling the truth"; "Do you want to tell this agent the truth or do you want to go ahead . . . with what you got? 'Cause what you got is going to drown you"; "So you want to sit here and stick to this stupid story and make you look like a fool and get held more accountable for the lie you're telling now than the one we was asking you about"; and "your story makes you look like you guilty of something." But "[i]t is well established that interview tactics such as telling the [defendant] that he could 'help himself' by telling the truth do not violate OCGA § 24-8-824." *Henderson*, 310 Ga. at 712 (2). See also *Peacock v. State*, 314 Ga. 709, 722 (4) (878

10

SE2d 247) (2022) ("Statements that a person . . . 'ha[s] an opportunity to help himself out by telling the truth' do not offer an improper hope of benefit" (citation and punctuation omitted)). And we have similarly held that statements indicating that a defendant will be "on the hook" for a more serious criminal charge if he fails to tell officers what happened do not violate the statute but instead permissibly "emphasize[ ] the gravity of the situation" and suggest that the defendant would be "well served by offering his version of events." *Dawson v. State*, 308 Ga. 613, 619-622 (3) (842 SE2d 875) (2020) (citation and punctuation omitted). See also *Johnson v. State*, 295 Ga. 421, 424-425 (2) (761 SE2d 13) (2014) (a detective did not "indicate that a confession would result in lesser charges," only that the defendant "would be well served by offering his version of events as a means of justifying or mitigating his role in the assaults," where he told the defendant that he wanted to hear the defendant's "version of events" and warned that the detective could walk out of the interview "and change this charge from aggravated assault to a f**[*]ing murder charge").

11

Second, the trial court focused on a comment in which Major Stuart said, "You can walk out that door with a little bit better feeling in your stomach, not be so queasy, after you tell him the truth." But "context matters." *Peacock*, 314 Ga. at 722 (4). And in context, Major Stuart's comment could not reasonably be interpreted as a promise that Leverette would be released if he told the truth. Instead, it was another comment in a series of comments indicating that law enforcement officers already knew that Leverette was involved in the shooting and that the benefit of telling the truth was that Leverette would feel better and that he would be seen as an honest person rather than a liar. Specifically, Major Stuart had previously said: "That little bad feeling you've got in your stomach right now, it can get a lot better just as soon as you tell that man the truth," or "it can get a lot worse"; "Now you can get rid of that little uneasy feeling in your stomach right now and tell [the GBI agent] what he already knows or you're going to make it worse"; and "Do you want to look like you're an honest person or do you want to look like you're a liar?"

Even if Major Stuart's comment could have been interpreted as a promise that Leverette would be released after he told the truth, "a promise regarding release after questioning" does not constitute an improper promise of benefit related to charges or sentencing but only a promise of "a collateral benefit" that does not render a confession inadmissible under OCGA § 24-8-824. *Price v. State*, 305 Ga. 608, 610 (2) (825 SE2d 178) (2019) (citation and punctuation omitted). See OCGA § 24-8-825 ("The fact that a confession has been made under . . . a promise of collateral benefit shall not exclude it."). See also *Huff v. State*, 299 Ga. 801, 803-804 (2) (792 SE2d 368) (2016) (no improper hope of benefit under OCGA § 24-8-824 based on comments "implying that [the defendant] would be free to see his children if he admitted his involvement in the crimes," including comments "about [the defendant] being present 'for his children as they grew up' and that 'the truth will set you free'"); *Finley v. State*, 298 Ga. 451, 453-454 (3) (782 SE2d 651) (2016) (no improper hope of benefit under OCGA § 24-8-824 where a detective told the defendant that "your quickest way to get to see your children or your quickest

13

way to take a large load off your shoulders, is just to tell the truth" (punctuation omitted)); *Woodall v. State*, 294 Ga. 624, 629 (4) (754 SE2d 335) (2014) ("While one of the officers interrogating appellant did tell him he could go home, such statements in context did not constitute a hope of benefit because no one promised appellant that he would not be charged with a crime or that he would receive reduced charges, sentencing or punishment if he made incriminating statements."), overruled on other grounds by *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020).

Third, the trial court focused on comments by Major Stuart suggesting that the occupants of the car were not responsible for firing the bullet that struck and killed the victim. In particular, the trial court highlighted Major Stuart's statement that "[w]e want to hold the man accountable that fired the round, not nobody in the car." But "[a]gain, context matters." *Peacock*, 314 Ga. at 722 (4).

Here, as recounted above, Major Stuart repeatedly encouraged Leverette to tell the truth about being in Etheridge's car by downplaying both Leverette's moral culpability for the victim's

14

death and law enforcement's interest in him in comparison with the person who fired the fatal shot. To that end, Major Stuart repeatedly emphasized that officers were not alleging that Leverette had fired the fatal bullet because they knew another man had shot the victim. Specifically, he said: "Y'all haven't been accused . . . of firing the shots that killed a man. I think you need to understand that. Okay? That's not why we're here"; "Nobody thinks for one minute that car that the shots was fired from killed an innocent person, and I want to make that clear"; "The good news in your corner is you're not being accused, or nobody in that car is being accused, of the bullet hitting that man that died"; and "We know that nobody in the car even shot the innocent bystander, much less you." And Agent Karsten used the same interrogation technique to exhort Leverette to tell the truth about being in Etheridge's car after Major Stuart left the room, telling Leverette, "We don't think people in the car shot the person that died."

These five statements, each of which was made within minutes of, and either before or after, Major Stuart's "accountability"

15

comment, used slightly different terminology to convey that Leverette should be truthful about being in Etheridge's car during the shootout because officers knew Leverette had not fired the fatal bullet. And because Major Stuart's comment about who officers "want[ed]" to hold "accountable" similarly emphasized that officers knew the people in Etheridge's car did not fire the fatal bullet and were focused on the person who did, a reasonable person in Leverette's position would have understood the comment as yet another exhortation to tell the truth about being in Etheridge's car, not as a statement that he would face "no charges" if he made incriminating admissions. *Lewis*, 311 Ga. at 658 (2) (a) (citation and punctuation omitted).

The dissenting opinion's conclusion that Leverette was offered an impermissible hope of benefit finds no support in our precedent. An investigator's comments constitute an impermissible hope of benefit under OCGA § 24-8-824 only if the defendant could have "reasonably understood" the comments to be "*promises* related to reduced criminal punishment." *Brown v. State*, 290 Ga. 865, 868-869

(2) (b), (c) (725 SE2d 320) (2012) (emphasis supplied). See also, e.g., *Edenfield v. State*, 293 Ga. 370, 374 (2) (744 SE2d 738) (2013) (focusing on whether the defendant could "reasonably have understood [an] assurance as a *promise* that he would not be charged with crimes . . . even if he admitted his own participation in such crimes" (emphasis supplied)), disapproved of on other grounds by *Willis v. State*, 304 Ga. 686 (820 SE2d 640) (2018). And here, even if Major Stuart's "accountability" comment could be divorced from its context and considered in isolation, Leverette could not have reasonably understood the comment as a *promise* not to charge him with murder under our precedent. This is because we have previously categorized statements indicating that investigators have "no present intention of charging [the defendant]" as mere exhortations to tell the truth, rather than as assurances that could "reasonably [be] understood" as "promise[s] that [the defendant] would not be charged with crimes." *Edenfield*, 293 Ga. at 374-375 (2). And Major Stuart's "accountability" statement, when considered in isolation, could have at most conveyed to Leverette a *present*

17

*intention* not to charge him with murder because the statement concerned only who officers "want[ed]" to hold accountable (a statement about officers' present desire that might support an inference about what they presently intended to do), not who officers "would" hold accountable (a promise about future charging decisions). Compare id. (no hope of benefit under OCGA § 24-8-824 where "investigators indicated to [the defendant] that they then had no present intention of charging [him] with anything" because "they believed [another man] was responsible for killing [the victim]"), with *Budhani v. State*, 306 Ga. 315, 317, 327 (2) (c) (830 SE2d 195) (2019) (holding that an investigator's statements — that, "if you said, Lieutenant Miller, I've been selling for five years[,] . . . there aren't any more charges. What you're charged with now is what you're charged with. I'm not going back and charging you" — constituted "a promise not to bring additional charges — and thus a hope of benefit — if [the defendant] gave police information about how long he had been selling XLR11" (punctuation omitted)), and *State v. Chulpayev*, 296 Ga. 764, 771-772 (2) (770 SE2d 808) (2015)

(holding that a defendant's statements were induced by an improper hope of benefit where an FBI agent told the defendant that "he would 'keep the murder warrant off' if [the defendant] talked to him," that "one of the things the agent cared most about was 'keeping [the defendant] out of jail,'" and that "I'm the lead on the case, and as much as you do for me, I will make sure nothing happens to you" (punctuation omitted)).

Under our precedent, Major Stuart's comment about not "want[ing]" to hold anyone in the car "accountable" clearly falls on the permissible side of the divide between statements that qualify as a hope of benefit under the statute and those that do not. See, e.g., *Currier v. State*, 294 Ga. 392, 399-400 (3) (754 SE2d 17) (2014) (no improper hope of benefit where a sheriff told the defendant, who was later charged with felony murder, that "he would be in less trouble for concealing [a] body" than for murder, that "no one was going to come after [the defendant] for getting rid of a dead body he found in his home," and that "the most [the defendant] could be charged with would be disposing of a body" if he told the sheriff what

19

he had heard about the body's whereabouts). Leverette "could not reasonably have understood this assurance as a promise that he would not be charged with crimes against [the victim] even if he admitted his own participation in such crimes." *Edenfield*, 293 Ga. at 374 (2). And for that reason, it is unsurprising that the dissenting opinion does not cite any analogous case from our Court supporting the conclusion that Major Stuart's comment here constituted a promise related to reduced criminal punishment.[4]

Because the trial court erred in excluding Leverette's statements under OCGA § 24-8-824 but failed to consider his challenges to the admissibility of his statements based on the Georgia Constitution, the United States Constitution, and certain United States Supreme Court precedents, we vacate the trial court's order suppressing Leverette's statements and remand for further proceedings consistent with our opinion.

*Judgment vacated and case remanded. All the Justices concur,*

---

[4] Although the dissenting opinion casts doubt on our current hope-of-benefit case law, neither the dissenting opinion nor the parties argue that we should overrule that precedent or chart a new course in this case. Accordingly, we apply the law as it stands.

*except Boggs, C. J., Peterson, P. J., and Warren and Pinson, JJ., who dissent.*

LAGRUA, Justice, concurring.

I join the majority's holding that Leverette's statements to law enforcement were not induced in violation of OCGA § 24-8-824 "by the slightest hope of benefit" under our current precedent. I write separately because I question whether Leverette's statements implicate OCGA § 24-8-824 in the first instance since they do not amount to a confession. See OCGA § 24-8-824 ("To make a *confession* admissible, it shall have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury.") (emphasis supplied). Instead, his statements are merely admissions, OCGA § 24-8-824 does not expressly mention admissions, and our caselaw extending this statute's rule to admissions stands on shaky ground.

As early as 1879, this Court recognized a distinction between confessions and admissions. See *Dumas v. State*, 63 Ga. 600, 603

21

(1879) (granting new trial where defendant admitted being present at the crime's commission, but denied guilt, such that a jury instruction on confessions was improper). We have reiterated that distinction consistently and on numerous occasions since then. See e.g., *Covington v. State of Ga.*, 79 Ga. 687, 690 (7 SE 153) (1887) (distinguishing confessions from admissions); *Owens v. State*, 120 Ga. 296, 298 (48 SE 21) (1904) (same); *Clarke v. State*, 165 Ga. 326, 331 (140 SE 889) (1927) (same); *Turner v. State*, 203 Ga. 770, 771 (2)-(3) (48 SE2d 522) (1948) (same); *Vergara v. State*, 283 Ga. 175, 177 (1) (657 SE2d 863) (2008) (same), overruled on other grounds by *Clark v. State*, 315 Ga. 423, 434-435 (3) (b) (883 SE2d 317) (2023); *Thomas v. State*, 308 Ga. 26, 30 (2) (b) (838 SE2d 801) (2020) (same). Our General Assembly has also long recognized the difference in these two terms of art. See OCGA § 24-8-823 ("All admissions shall be scanned with care, and confessions of guilty shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction."); *Johnson v. State*, 61 Ga. 305, 308 (1878) (observing that "[t]he 3792 section of the Code

22

declares, that 'all admissions should be scanned with care, and confessions of guilty should be received with great caution'").

So, what's the difference? We summed it up well in *Walsh v. State*: "An admission differs from a confession in that a confession acknowledges all of the essential elements of the crime." 269 Ga. 427, 429-430 (1) (499 SE2d 332) (1998).[5] Put simply, in a confession, "the entire criminal act is confessed." *Clarke*, 165 Ga. at 331 (citing *Owens*, 120 Ga. at 298). Admissions, on the other hand — which we have at times referred to as "mere incriminating statements" — do not acknowledge every essential element of the crime. Instead, these statements come up short of a true confession for one reason or another. See *English v. State*, 300 Ga. 471, 474 (2) (796 SE2d 258) (2017) ("[I]n an admission, only one or more facts entering into the

---

[5] Our caselaw distinguishing admissions from confessions on the basis of the crime's essential elements stands in some tension with another line of cases, where we have described the difference between admissions and confessions as being "whether the statement is offered by the accused as exculpatory or inculpatory[.]" See *Robinson v. State*, 232 Ga. 123, 126-127 (2) (205 SE2d 210) (1974) (concluding that a statement which did not establish all essential elements of the crime was nonetheless a confession within the meaning of OCGA § 24-8-824, such that jury instruction on confessions was not error, because the main fact was admitted without justification or excuse and "the statement [wa]s not one from which the jury could infer innocence").

23

criminal act are admitted, while in a confession, the entire criminal act is confessed.") (cleaned up); *Thomas*, 308 Ga. at 30 (2) (b) ("A mere incriminating statement is made where the accused, though admitting to damaging circumstances, nonetheless attempts to deny responsibility for the crime charged by putting forward exculpatory or legally justifying facts.") (cleaned up). See also *Covington*, 79 Ga. at 690 ("When a person only admits certain facts from which the jury may or may not infer guilt, there is no confession. We may use the word confessions for admissions, but to sum up mere inculpatory admissions and denominate them a confession, implies that they amount to a confession of guilt.").

In the present case, Leverette's statements do not amount to a confession to the crimes for which he was indicted because they do not acknowledge all the essential elements of aggravated assault.[6] The State can only obtain a conviction at trial on this charge if it proves, among other elements, that Leverette assaulted another

---

[6] Because aggravated assault is the predicate felony for the felony murder charge, if Leverette's statements do not amount to a confession to aggravated assault, they cannot constitute a confession to felony murder.

24

person within the meaning of the simple assault statute, OCGA §

16-5-20 (a). See *Huber v. State*, 319 Ga. 78, 87 (3) (a) (901 SE2d 149)

(2024) (citing to pattern jury instructions for elements of aggravated

assault); OCGA § 16-5-21 (a). To satisfy this element, the State must

prove Leverette either "attempt[ed] to commit a violent injury to the

person of another" or "commit[ted] an act which place[d] another in

reasonable apprehension of immediately receiving a violent injury."

OCGA § 16-5-20 (a). But Leverette's statements do not establish

either on their own. His admission that he fired a weapon at Hale,

Sr.'s home does not establish that he attempted to commit a violent

injury to the person of another. While facts presented at trial might

allow a jury to infer that Leverette attempted to do so, his admission

does not establish that he knew the home to be occupied at the time

he fired the shot.[7] Moreover, his statements do not establish that his

firing of a weapon at Hale, Sr.'s home placed anyone in reasonable

---

[7] Leverette said that he knew Hale, Jr., was outside the home, but that he aimed at the home itself, rather than at Hale, Jr. Additionally, the presence of vehicles in the driveway does not establish whether Leverette knew someone was in the home when he fired the shot.

25

apprehension of immediately receiving violent injury. Again, while facts presented at trial might support that conclusion, Leverette's statements do not suggest that he knew his act of firing the weapon caused someone else to be placed in reasonable apprehension of immediately receiving a violent injury. For these reasons, Leverette's statements amount to admissions, and do not rise to the level of a confession, as the State will be put to its proof at trial, and the jury will be required (at least on these facts) to draw some inferences for the State to obtain a conviction. See *Covington*, 79 Ga. at 690 ("When a person only admits certain facts from which the jury may or may not infer guilt, there is no confession.").

With respect to confessions, it has long been the rule that only voluntary confessions are admissible against a defendant at trial. See *State v. Chulpayev*, 296 Ga. 764, 780 (3) (b) (770 SE2d 808) (2015) (observing pre-founding common law rule that confessions "made under threats and promises" were inadmissible at trial). The first statutory iteration of the rule now codified at OCGA § 24-8-824 was derived from this common law "threats and promises" principle

26

but differed in its word choice: "To make a confession admissible, it must have been made voluntarily without being induced by another, by the slightest hope of benefit or remotest fear of injury." See *Chulpayev*, 296 Ga. at 780 (3) (b) (citing Ga. Code of 1863, § 3716). Once codified, the law in Georgia became that a confession was deemed involuntary if induced by the slightest hope of benefit or the remotest fear of injury, and the statutory language of that rule has remained substantively unchanged to this day.[8]

Neither OCGA § 24-8-824 nor any of its predecessors says anything about "admissions" or "incriminating statements." Instead, each iteration of the rule refers only to a "confession," i.e., a statement that "acknowledges all of the essential elements of the crime." *Walsh*, 269 Ga. at 429-430 (1). On its face, this suggests the

---

[8] Compare *McLemore v. State*, 181 Ga. 462, 466 (182 SE 618) (1935) ("In all of the Codes of Georgia (1863, § 3716; 1868, § 3740; 1873 and 1882, § 3793; Penal Code of 1910, § 1932; Code of 1933, § 38-411), the rule governing the admissibility of confessions is embodied in the following pungent language: 'To make a confession admissible, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit or remotest fear of injury.'"), with former OCGA § 24-3-50 ("To make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."), and OCGA § 24-8-824 (same).

27

rule does not apply to admissions. After all, "when we consider the meaning of a statute, we must presume that the General Assembly meant what it said and said what it meant[,]" and nothing has ever been said by the General Assembly about admissions or incriminating statements in the context of this rule. *Deal v. Coleman*, 294 Ga. 170, 172 (1) (a) (751 SE2d 337) (2013) (cleaned up). See id. at 172-173 (1) (a) ("[W]e must afford statutory text its plain and ordinary meaning . . . if the statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end.") (cleaned up). And yet, despite our recognition of the difference between these two types of statements, at some point along the way, we began to treat them as one and the same for purposes of this rule without the General Assembly ever telling us to do so.

Putting aside the lack of support in the text itself, I have doubts about our precedent supporting the extension of this rule to mere incriminating admissions. The most recent precedent directly on point is *Vergara*, where we expressly "reject[ed] the State's

28

argument that [former] OCGA § 24-3-50 does not apply to Vergara's statements to law enforcement because they constitute incriminating statements rather than a confession." 283 Ga. at 177 (1).[9] There, we said that "[i]t has long been the law in this State that the rule as to the admissibility of an incriminatory statement is the same as that applied to a confession" and overruled several cases "[t]o the extent that [they] hold otherwise." 283 Ga. at 177 (1).[10] However, to support that proposition and the overruling of precedent, we engaged in no independent analysis and gave no consideration to any of the factors that make up our modern approach to stare decisis.[11] See id. Instead, we simply pointed to three cases in support of a conclusion that "the rule as to the

[9] We reaffirmed *Vergara* in *Chulpayev*, 296 Ga. at 771 (2) n.4, where we similarly rejected the State's attempt to draw a distinction between "full confessions and mere incriminatory statements" in the context of the rule set out at OCGA § 24-8-824.

[10] Among the cases overruled by *Vergara* was *Carruthers v. State*, which concluded that the trial court did not abuse its discretion in denying the defendant's motion to suppress statements made prior to formal custodial interrogation on the basis that the defendant's "statement did not constitute a confession, and, therefore, [OCGA] § 24-3-50 is inapplicable." 272 Ga. 306, 313 (5) (528 SE2d 217) (2000) (citations omitted) (decided under former code).

[11] See *Ammons v. State*, 315 Ga. 149, 156 (2) (a) (880 SE2d 544) (2022) (describing stare decisis considerations).

admissibility of an incriminatory statement is the same as that applied to a confession." See id. at 177 (1) (citing *Fletcher v. State*, 90 Ga. 468, 469 (17 SE 100) (1892), *Fuller v. State*, 109 Ga. 809, 811-812 (35 SE 298) (1900), and *Turner*, 203 Ga. at 771 (3)). Strictly speaking, however, none of those cases truly support the proposition asserted.

In *Fletcher*, for example, the opinion authored by then-Chief Justice Bleckley suggested that it was "the practice in this State" to exclude involuntary admissions in 1892 but then specifically noted a lack of "any direct adjudication upon the precise question" of whether the rule excluding involuntary confessions also applied to admissions. 90 Ga. at 469. The *Fletcher* Court then assumed without deciding that the rule applied to both types of statements for purposes of the case before it. See id. ("[b]ut grant[ing] that the same rule holds with respect to criminating admissions as with respect to confessions of guilt . . ."). Ultimately, that assumption did not bear on the holding in the case, which dealt with whether the trial court erred by allowing the jury to be present during a preliminary

examination of the law enforcement officers who elicited admissions from the defendant in seeking to determine whether those statements were voluntary. See id. at 469-470 (concluding that any error arising from the jury's presence during the preliminary examination was harmless because "the admissions were in fact free and voluntary, and were therefore properly receivable in evidence," but ultimately reversing conviction due to insufficient evidence).

Then there is *Fuller*, which, after distinguishing confessions from admissions, suggested that "the sounder view of the law touching the admissibility of such declarations on the part of one charged with crime is to exclude them, if not voluntarily made, upon the same principle as the defendant's statement would be excluded if it amounted to a direct confession of guilt." 109 Ga. at 811-812. Immediately thereafter, however, the *Fuller* Court stated that "it is not necessary to decide directly this question, or to undertake to reconcile authorities, or determine the weight of authority upon the subject" of whether admissions and confessions are treated the same for purposes of exclusion under the rule because, "under the facts of

this case, we think there is nothing in the record which indicates that this statement of the defendant was not freely and voluntarily made[.]" Id. at 812. Again, we did not directly hold nor answer the question of whether the rule excluding involuntary confessions applied to admissions because, even if it did, the statements in this case were voluntary, and thus admissible without respect to their characterization. See id. at 811-814.

Finally, the *Turner* Court held that the trial court erred by allowing a defendant's incriminating statement to be admitted at trial because it was elicited by a sheriff's suggestion that telling the truth would result in a lighter sentence. 203 Ga. at 770-771 (1), (2), and (3). The *Turner* Court did not itself conclude admissions were treated the same as confessions for purposes of exclusion but merely cited to *Fuller*, 109 Ga. 809, and *Mill v. State*, 3 Ga. App. 414 (60 SE 4) (1908), for the proposition that "the rule as to [a mere incriminating statement's] admissibility is the same as that applied

32

to a confession." Id. at 771 (3).[12]

As best I can tell, this Court has never fully examined when, and on what basis, the rule now codified at OCGA § 24-8-824 was extended to admissions. It might be that, in a case from a past era, we clearly did so and soundly concluded that involuntary admissions

---

[12] Much like the *Vergara* Court, in *Turner*, we simply cited to cases to support our asserted proposition without conducting any additional analysis. See 203 Ga. at 771 (3). Moreover, like *Vergara*, the cases upon which *Turner* relies do not persuasively support that proposition.

As explained above, *Fuller* expressly pointed out that it was not "decid[ing] directly this question" of whether the rule applied to both confessions and admissions. 109 Ga. at 812. *Mill*, for its part, was a one-sentence decision from the Court of Appeals — which does not bind us in the first instance — stating only that "[i]nculpatory admissions, as well as plenary confessions, in order to be admissible against the defendant must be voluntary, and not induced by 'the slightest hope of benefit or the remotest fear of injury.'" 3 Ga. App. at 414. *Mill*'s support for that statement was drawn from *Johnson v. State*, 1 Ga. App. 129 (57 SE 934) (1907), which applied the rule applicable to confessions to the admissions made in that case. However, I see little precedential value in *Johnson*'s reasoning, since the Court of Appeals found that the rule applied despite observing that the statements were not "admitted . . . as a confession, or as evidence of inculpatory admissions that might tend to show the defendant's guilt[,]" and in light of outside circumstances which the opinion suggests may have influenced its outcome. See id. at 131-132 ("In arriving at the conclusion in this case that these statements are not admissible, we have been influenced not only by the language itself, but by the situation presented by the evidence, — the dominating power and influence of the white man who had arrested, as he states, on mere suspicion without a warrant, a negro, and unlawfully searched him, his wife, and his house, and was taking him to jail."). It is further worth observing that this Court has never cited to *Johnson*, and the Court of Appeals has only done so on a handful of occasions, with the most recent instance being more than a half-century ago. See *Bryant v. State*, 132 Ga. App. 186 (207 SE2d 671) (1974).

33

were subject to exclusion; but if that is so, my research has revealed no such case. More likely, in my view, is that we have simply relied upon past assumptions of this Court without scrutiny. At a minimum, I have doubts about whether we should continue to rely upon *Vergara* given its misplaced citations and lack of analysis.[13]

To be clear, while it is an open question in my mind whether the rule now codified at OCGA § 24-8-824 applies to admissions, I do not mean to suggest that involuntary admissions would in all cases be admissible at trial. Instead, it is my view that the admissibility of such statements should be evaluated as a matter of constitutional due process, consistent with *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966), and its progeny, rather than under what appears to be a judicially created rule extending OCGA § 24-8-824 to admissions. In the appropriate case, I encourage

---

[13] My doubts in this respect are multiplied by our holdings in *Thomas*, 308 Ga. at 30 (2) (b), and *McMullen v. State*, 300 Ga. 173, 174 (1) (794 SE2d 118) (2016), where we declined to extend OCGA § 24-8-823's rule to mere admissions on the basis that the plain language of the statute only applies to confessions. See OCGA § 24-8-823 ("All admissions shall be scanned with care, and confessions of guilt shall be received with great caution. A confession alone, uncorroborated by any other evidence, shall not justify a conviction.").

my colleagues to join me in taking a closer look at this issue so that we may provide clarity on the same.[14]

PETERSON, Presiding Justice, dissenting.

1. I respectfully dissent from the majority opinion because, even under our current interpretation of OCGA § 24-8-824, we cannot say that the trial court erred in concluding that Leverette's statements were induced by the hope of a benefit. Here, Major Stuart's statement that "[w]e want to hold the man accountable that fired the round, not nobody in the car" is reasonably understood to mean that Leverette would not be charged or arrested for the death of the "innocent person" if he acknowledged that he was in the car.[15]

---

[14] Of course, the General Assembly could also preemptively resolve my concerns by clarifying whether OCGA § 24-8-824 applies to admissions as well as confessions.

[15] Our precedent has not articulated consistently the appropriate standard for determining whether a confession is inadmissible under OCGA § 24-8-824. Compare *Golden v. State*, 310 Ga. 538, 542-543 (2) (852 SE2d 524) (2020) (analyzing whether the defendant's statement was induced by an impermissible hope of benefit under "the totality of the circumstances" (citation and punctuation omitted)), with *Brown v. State*, 290 Ga. 865, 869-870 (2) (c) (725 SE2d 320) (2012) (analyzing whether the defendant could have "reasonably understood" law enforcement's statements as offering a hope of

benefit), and *Kessler v. State*, 311 Ga. 607, 611 (2) (858 SE2d 1) (2021) (analyzing whether the defendant's confession was "actually induced" by the alleged hope of benefit).

It seems to me that the best way to make sense of our caselaw is that the applicable standard has two parts: one objective and one subjective. First, courts determine whether the State made statements that objectively could be viewed by a reasonable defendant as offering an impermissible hope of benefit (or threatened injury), considering all the relevant circumstances. See, e.g., *Mitchell v. State*, 314 Ga. 566, 573 (2) (a) (878 SE2d 208) (2022) (concluding after "[r]eviewing the exchange as a whole" that the record supported the trial court's conclusion that "no person in [the defendant's] position would have believed that the interviewing detective was making a credible death threat"); *Rivers v. State*, 296 Ga. 396, 400 (3) (768 SE2d 486) (2015), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 17 (1) (838 SE2d 808) (2020) (noting that the "[a]ppellant's personal belief . . . does not render his statements involuntary" under precursor to OCGA § 24-8-824 and concluding that under "the totality of the circumstances" that the trial court's conclusion that the statement was voluntarily made was not erroneous); *Edenfield v. State*, 293 Ga. 370, 374 (2) (744 SE2d 738) (2013), disapproved of on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018) ("When its context is considered, it becomes clear that [the defendant] could not reasonably have understood [law enforcement's] assurance as" an impermissible hope of benefit.); *Vergara v. State*, 283 Ga. 175, 181 (1) (657 SE2d 863) (2008), disapproved of on other grounds by *Clark v. State*, 315 Ga. 423, 435 (3) (b) n.16 (883 SE2d 317) (2023) (concluding under "the totality of the circumstances that a reasonable person in [the defendant's] position" would not have understood the officer's statements as an impermissible hope of benefit); *State v. Folsom*, 286 Ga. 105, 110-111 (3) (686 SE2d 239) (2009), overruled on other grounds by *State v. Abbott*, 303 Ga. 297, 303-304 (3) (812 SE2d 225) (2018) (rejecting defendant's contention that "a person in [the defendant's] position would have reasonably viewed [an officer's] statement" as an impermissible hope of benefit "[u]nder the totality of the circumstances"); *Gober v. State*, 264 Ga. 226, 228 (2) (b) (443 SE2d 616) (1994) (holding that a statement "was not a threat, and was not otherwise reasonably likely to induce a fear of injury" "[c]onsidering the totality of the circumstances"); *Duke v. State*, 268 Ga. 425, 426 (2) (489 SE2d 811) (1997) (holding that "[u]nder the totality of the circumstances" the defendant "could not reasonably have believed that, if he implicated himself in his statement, officers . . . would not charge him with any crime whatsoever"). In context, this repeated use of "totality of the

In fact, that's precisely how I (and the trial court) understand that statement. And Leverette's incriminating statements followed Major Stuart's statement such that they seem likely to have been induced by it, as the trial court also found. In response, the majority asserts that our understanding is unreasonable because Major Stuart's "accountable" statement should be understood as simply another exhortation to tell the truth, because he had also told Leverette several times that Leverette should tell the truth. But

_____

circumstances" is best understood not as an uncritical importation of the distinct federal due process voluntariness standard, see *State v. Franklin*, 318 Ga. 39, 42 (3) (897 SE2d 432) (2024), but as a directive that a reviewing court consider all the relevant context in determining whether the statement objectively offered a hope of benefit or threat of harm.

Second, if a statement did offer a hope of benefit or threaten harm, a court must then determine whether that statement actually induced the defendant's confession. See, e.g., *Budhani v. State*, 306 Ga. 315, 326 (2) (b) (830 SE2d 195) (2019) (reasoning that a statement is inadmissible under OCGA § 24-8-824 if (1) law enforcement has promised an impermissible hope of benefit and (2) the benefit actually induced the defendant's statement); *Lewis v. State*, 311 Ga. 650, 658 (2) (a) (859 SE2d 1) (2021) (pretermitting whether law enforcement's statements constituted an impermissible hope of benefit and concluding that the defendant "failed to demonstrate that the statements induced his [ ] confession"); *Pulley v. State*, 291 Ga. 330, 332 (2) (729 SE2d 338) (2012) (reasoning that "the voluntariness of a statement does not depend solely upon whether it was made in response to promises, rather, the court must determine voluntariness by judging the totality of the circumstances" and "the key inquiry is whether the alleged promise actually induced the statement that Appellant seeks to suppress") (cleaned up). The combination of these two considerations seems to me sensible in the light of the text of the statute.

37

those other statements by Major Stuart are not "context" that changes what strikes me as the clear meaning of his "accountable" statement, they were simply other attempts to convince Leverette to talk. In short, even a faithful application of our precedent — with all of its current flaws — leads to the conclusion that Leverette's statement was induced by the hope of a benefit, and thus the trial court did not err in excluding it. Accordingly, I respectfully dissent.

2. That said, I also take this opportunity to offer an additional observation about the statute at issue today. Our caselaw interpreting OCGA § 24-8-824 has departed far from the statutory text.

We routinely claim that when "statutory text is clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." *Star Residential, LLC v. Hernandez*, 311 Ga. 784, 785 (1) (860 SE2d 726) (2021) (quoting *Deal v. Coleman*, 294 Ga. 170, 173 (1) (a) (751 SE2d 337) (2013)). The statute we encounter today requires that for a confession to be admissible, it must "have been made voluntarily, without being

induced by another by the slightest hope of benefit or remotest fear of injury." OCGA § 24-8-824. This statute is apparently an exception to our plain meaning rule, because — over and over and over again — our recent precedent has flatly ignored and contravened its text.

Over 150 years ago, the Georgia Code first incorporated a provision forbidding the admission of any confession that was "induced by another, by the slightest hope of benefit or remotest fear of injury." See Ga. Code of 1860, § 3716.[16] This evidentiary rule, as a

---

[16] This appears not to have been the result of legislative action by the General Assembly, but was instead derived by the codifier from two decisions of this Court. See *Rafe v. State of Ga.*, 20 Ga. 60 (1856); *Stephen v. State of Ga.*, 11 Ga. 225 (1852); see also *Sons of Confederate Veterans v. Henry County Bd. of Comm'rs*, 315 Ga. 39, 58 (2) (c) (ii) n.14 (880 SE2d 168) (2022) (noting that early codes were compiled differently from current practice, and that "many statutes appeared in those codes that had never been individually enacted by the General Assembly; instead, they were legal principles often derived from decisions of this Court"). The only actions of the General Assembly regarding this statute appear to be the regular adoption of codes as a whole (which, of course, the Single Subject Matter Paragraph prohibits from changing the law). See Ga. Const. of 1983, Art. III, Sec. V, Par. III ("No bill shall pass which refers to more than one subject matter or contains matter different from what is expressed in the title thereof."); cf. *Curtis v. Ashworth*, 165 Ga. 782, 784 (142 SE 111) (1928) (observing in the context of considering conflict between legislative acts that "we cannot give to an act of the legislature adopting a Code the same effect as we give to an act dealing with a single subject-matter, and promulgating a single principle of law").

matter of text, has remained materially identical since then and now appears in OCGA § 24-8-824. For decades, Georgia courts applied the statute as written and excluded confessions that were so induced. See, e.g., *Dixon v. State*, 113 Ga. 1039, 1039 (39 SE 846) (1901) ("[A]ny advice to a [defendant] under arrest, by the officer having her in custody, to the effect that if she knew anything she had better tell it, vitiates a confession induced thereby."); *Green v. State*, 88 Ga. 516, 516 (15 SE 10) (1891) (concluding confession was inadmissible when defendant was told "if you know anything, it may be best for you to tell it").

The *Green* Court emphasized that, although "it is difficult to draw a precise line between" admissible and inadmissible confessions, courts should "adhere closely to the plain" language of the statute. 88 Ga. at 518. As a result, confessions were generally excluded as involuntary if the defendant was advised that providing information would serve his or her self-interest, while confessions induced by exhortations to tell the truth were admissible, as they did not "tend to produce a false statement." *Wilson v. State*, 19 Ga.

40

App. 759, 765, 769 (92 SE 309) (1917) (noting the difference between the advice to "tell the truth," which would not render a confession inadmissible, and a statement that "it will be better for [a defendant] to tell," which would render a confession inadmissible because it would induce a party to offer a "confession, regardless of its truth or falsity"); see also *McLemore v. State*, 181 Ga. 462, 471 (182 SE 618) (1935) ("There is a material difference between a statement to a prisoner that it would be better for him to tell the truth, and one wherein he is told that it would be better for him to make a *confession*." (emphasis in original)).

But more recently, this rule has changed, even though the statutory text has not. See, e.g., *Fowler v. State*, 246 Ga. 256, 258 (4) (271 SE2d 168) (1980) (holding that defendant's admissions following officer's statement of "something to the effect that it looked like [the defendant was] in a heap of trouble and it would behoove him if he shot straight with us" was admissible); *Arline v. State*, 264 Ga. 843, 843-844 (2) (452 SE2d 115) (1995) (holding that an incriminating statement was admissible even though the detective

41

"told [the defendant] that the trial court might consider that he was not the triggerman and that he cooperated with the police"). Tension developed in the caselaw. Compare *King v. State*, 155 Ga. 707, 715-716 (118 SE 368) (1923) (holding that a confession was inadmissible when it was induced by the officer's statement that "as a general rule courts were lighter on those who did not give them much trouble" even though the officer also told the defendant that he "could not promise him anything" and the decision was ultimately "a matter for the judge") with *State v. Summers*, 173 Ga. App. 24, 26-27 (2) (325 SE2d 419) (1984) (holding that an incriminating statement was admissible despite the officer's promise that he "would tell the district attorney of [the defendant's] cooperation and thereby possibly lighten any sentence" because the officer cautioned that "only the judge could reduce the charge or the sentence"). And then, in 1996, we removed the tension by judicially rewriting the statute to conclude that "slightest hope of benefit" instead meant little more than an express statement that the suspect's charge or sentence would be reduced. See *White v. State*, 266 Ga. 134, 135 (3)

42

(465 SE2d 277) (1996).[17]

Now, all this said, I am not at all sure that the statute is necessary these days. Federal law protects defendants from coerced confessions both through requiring *Miranda*[18] warnings and through the application of the totality of the circumstances test for voluntariness under the Due Process Clause. If the statute does much more than those two federal protections already offer and thus excludes confessions made voluntarily and with full knowledge of the rights included within *Miranda* warnings, the statute (which, again, the General Assembly has never actually enacted) may do more than the General Assembly would like. And if it doesn't do

---

[17] In *White*, the Court — without any analysis of the statutory text or prior precedent — asserted that "the promise of a benefit that will render a confession involuntary under OCGA § [24-8-824] *must* relate to the charge or sentence facing the suspect." 266 Ga. at 134 (3) (emphasis added) (citing *Johnson v. State*, 238 Ga. 27, 28 (1) (230 SE2d 849) (1976)). But *Johnson* does not support this proposition. Rather, in *Johnson*, the Court held that a promise of a lighter sentence falls within the ambit of OCGA § 24-8-824; nothing in the opinion *limited* OCGA § 24-8-824 to promises relating to charging or sentencing. 238 Ga. at 27-28 (1). Courts now repeatedly parrot *White*'s unsupported assertion. See, e.g., *Brown v. State*, 290 Ga. 865, 869 (2) (b) (725 SE2d 320) (2012); *In the Interest of D. T.*, 294 Ga. App. 486, 488-489 (2) (669 SE2d 471) (2008); *Foster v. State*, 283 Ga. 484, 485 (2) (660 SE2d 521) (2008); *Sparks v. State*, 232 Ga. App. 179, 184 (4) (501 SE2d 562) (1998).

[18] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

more, then litigation about it merely wastes the time of courts, lawyers, and the public. But so long as the General Assembly leaves the statute on the books, we should at least consider whether we should apply it as it's written and as it was historically understood.

This, however, is not the case in which to consider changing course. Even under our current precedent, the trial court did not err in excluding Leverette's statement. I respectfully dissent.

I am authorized to state that Chief Justice Boggs, Justice Warren, and Justice Pinson join this dissent.

Decided February 18, 2025.

Murder. Sumter Superior Court. Before Judge Sizemore.

*Lewis R. Lamb, District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General*, for appellant.

*Eric L. Gay; Shingler & McMillan, Douglas R. McMillan*, for appellee.